113 1105|
121  486|

## LYNCH v. FLORIDA CENTRAL AND PENINSULAR RAILROAD COMPANY.

A railroad company is not liable for damages resulting from an assault and battery inflicted by its station agent and another upon a third person, when it appears that the difficulty which gave rise to the beating arose out of a personal quarrel, and that the agent, so far as related to his participation therein, was acting upon his individual responsibility and not within the scope of the business of his agency as an employee of the company.

Submitted June 13, — Decided July 23, 1901.

Action for damages.    Before Judge Seabrook.    Effingham superior court.    November 12, 1900.

The plaintiff testified: On December 17, 1898, I was at Rincon, a station on the railroad of the defendant company, engaged in loading wood on cars which had been sent by the company to me, so that I might ship my wood to Savannah. I was loading at a point about thirty feet north of the warehouse. It had been customary to haul wood and put it on an embankment, and then pitch it into the cars. It was about twenty feet from edge of embankment to car door. I had driven my team between embankment and door, and was unloading the wood from the wagon to the car. I had always done this; it was customary with everybody to do this way. Shortly after I began unloading, Willie Simmons, agent of the road at Rincon, came and said, "I believe you have been driving in that ditch." I said, "No, I have not." He then said, "I don't want you to drive in there any more." J. V. Hinely, who was with me, said, "Oh, Willie, there aint nobody kicking but you," and he said, "Yes, I have got authority to keep you out." Hinely said, "Go show your authority." He said, "I have a paper in the office." Hinely said, "Fetch it," and Willie brought it, but it did not say anything about driving in the ditch, only that you must not throw wood in the ditch and leave it so as to stop the drainage of the road-bed. I was not throwing wood in the ditch. What I hauled there I would throw on side of the embankment, and when the cars were there I would throw it from the wagon into the cars. The paper said not to throw wood into the cut. It had been the custom by most everybody to haul wood there and throw it into the cut and leave it there. Willie said, "I don't care.

I don't want you to drive in there any more." I went on and put in the wood I had hauled and thrown down. The teams came right on in, and he came down again and said, "I told you to keep out of this cut; and if you don't, I will blockade it with crossties so you can't come in." I said, "Oh, Willie, go on. I don't think the head men will give you authority to keep me out of here." He said, "I don't care what the head men say. I want to keep you out of here." He went back, and in five or ten minutes afterwards the pay-train came up. I went to it and saw Mr. Burroughs, who is, I think, the roadmaster, and was on the train. I told him that I had been informed by the agent here not to drive in the cut to unload my wood, and that it was very inconvenient not to drive in and transfer my wood from wagon to car. He told me to go ahead and haul all I wanted to, so long as I did not throw it into the ditch or cut and stop the drainage. I told him all right, and as I was going back Simmons was standing on the warehouse shed. I said, "Oh, Willie, I made it all right." He said, "How so?" I said, "Mr. Burroughs told me to go ahead and haul all I wanted to there, so long as I did not throw any in the ditch." Then he said, "Well, I will see you don't do it." I went on back to my car; he followed me and said, "I don't want you to drive in here any more, and you must not, and must keep out of here." I said, "Mr. Burroughs told me I could drive in here, and it was reasonable I should listen to him." He said, "I don't care what Mr. Burroughs or Mr. Robinson says. I have got the whole thing in my charge, and they have got nothing to do with it. I will see that you keep out of here. Your principle is lower than a dog's; for if it was not, you would listen to me; and if you will get out of that car I will beat you." I had said nothing to induce this remark. I said, "Willie, go on; your place is in the office; go and let me alone." He then turned off with a threat that he was coming back, and said, "I will see that you don't come down here any more with your wood." I think he was angry.

I then quit loading, and went about a hundred yards down the road, where Willie Simmons' father was loading a car of wood, so that he might tell him not to come down there any more to disturb me. I told his father how his son had been treating me, and about his conduct; and the father said, "Any time you want to jump on me or my boy you can do it." I told him that I did not want to bother

him or his boy, but that I wanted his boy not to come down there and interrupt me any more. His father said, "We will go and see about it," and we walked up to the warehouse. I was going towards my car, and as I got to the warehouse Willie Simmons' father said to him, "Willie, have you insulted this man?" Willie said, "No." He was standing on the warehouse shed. I was on the ground about ten feet from him. John Simmons shook his fist in my face, and said, "If you impose on my boy, you just as well impose on me." Then Willie Simmons jumped off the platform, and said, "Here is a pile; jump on," and struck me in the right side. There was a board about ten feet off, and Willie and I made for it. In a second he struck me on the nose with his fist; then he struck me in the jaw. The blows made the blood flow from my nose and mouth. I was struck on top of the head, the blow making a bad wound, and almost knocking me senseless. I retreated, and they both followed me. Hinely kept them off. Willie Simmons gave me the blows I have described. I had never, before the conversation already related, had a cross word with him. The blows on my head, making the wound on top, may have been made by John Simmons. They could not have been made with a fist.

Hinely and another witness testified for the plaintiff, in substantial agreement with foregoing, except their testimony showed that the blow on the top of the plaintiff's head was made by John Simmons with a piece of plank or scantling.

*D. H. Clark*, for plaintiff.
*Denmark, Adams & Freeman*, for defendant.

LITTLE, J. It can not be denied that the plaintiff was very imprudent, in his actions towards the agent of the defendant, in refusing to obey his instructions in reference to driving in the cut with his loaded wagon; and it is apparent from the evidence that he drew the difficulty, in which he was injured, upon himself. The station agent presumably represented the railroad company in an attempt to enforce against the plaintiff certain regulations in relation to the loading of cars, which the agent claimed existed. It was, as will be seen from the report of the evidence, a reprehensible act on the part of the plaintiff, not only to refuse to conform to such regulations, but also in denying the right of the agent to enforce them. It was not becoming in him to question the authority of the

agent to enforce the regulations which the latter said existed.   He·
should have submitted and made his complaint to the proper and.
superior authority, and obtained redress in that way.   Two other
things are also apparent from the evidence.   The first is, that the
injuries from ·which the plaintiff really suffered were not by the
younger Simmons, who was the company's agent, but by his father,
and also, at the time he received the beating, he had not ap-·
proached the agent on the business of the company, but to settle
a personal grievance.   Surely no one can entertain such a distorted
view of the law as to claim that the railroad company was respon-
sible to the plaintiff for a battery inflicted upon him by the elder·
Simmons, who, so far as the evidence shows, was not connected.
with the railroad company in any capacity.   Nor can it be success-·
fully claimed that if the plaintiff sought the younger Simmons·
even on premises of the railroad company, for· the purpose of ad-
justing a private grievance, although the one so sought was at the
time its agent, the company would be held liable for personal in-·
juries inflicted on the plaintiff by such agent, as the result of an
unsuccessful effort to adjust their personal differences.   The rules·
of law which control the question of the liability of a master to re-·
spond in damages for a tort of this character, committed by its
agent on a third person, have been repeatedly considered by this
court.   In the case of *Christian* v. *C. & R. Ry. Co.*, 79 *Ga.* 460, it·
was ruled that a railroad company was liable in damages for the
wrongful homicide of its customer, committed by its depot agent in
its office whilst the customer was lawfully there for the transac-·
tion of business with such agent pertaining to his agency.   When.
the same case was for the third time before this court, as reported
in the 97 *Ga.* 56, the proposition of law announced in the first de-·
cision of the case was more fully explained, and this court ruled :
"For the wrongful act of an employee of a railroad company re-·
sulting in injury to another, committed while engaged in the per-
formance of the company's business in the line of his duty, the com-
pany is liable.   But if while so engaged, upon some private feud
previously existing or suddenly arising, wholly disconnected with
his duties as such employee and not pertaining to the business then
in process of transaction (the company then not owing to the other·
person the duty of personal protection), he commit injury upon
the person of another, the company would not be liable."   In.

delivering the opinion in that case Mr. Justice Atkinson, further elaborating the proposition of law then in question, said : " If while the employee is engaged about the business of the master, upon some matter or some provocation wholly disconnected with the performance of his duties as a servant, upon some private feud, in an altercation with a third person, he should commit any injury upon such third person, such injury would not fall within the class for which the master is liable, unless it be a case in which, by reason of the relation existing between the person thus injured and the railroad company, the latter owed to the former the special duty of personal protection."

Again, in the case of the *Georgia R. Co.* v. *Richmond,* 98 *Ga.* 495, where the facts brought into consideration the principle of law we are now considering, this court ruled, that if the real purpose of the person assaulted, in returning to the station, was not to look after or arrange for checking baggage, or to attend to other legitimate business with the agent, but merely to upbraid him for a real or supposed breach of duty occurring at an earlier hour of the day, and the difficulty thereupon ensued, the two met as ordinary citizens, and the railroad company had no concern in what passed between them.    In delivering the opinion in that case Mr. Justice Lumpkin stated the proposition that if the injured person went to the station to attend to business connected with the railroad company, and conducted himself properly, he was entitled to respectful treatment from the agent; " and if the latter, under these circumstances, unlawfully assaulted and beat him, it was his right to hold the company responsible in damages;" and he also there said : " It may, in this connection, be proper to add, however, that even if Richmond went to the station for the lawful purpose of attending to the business above mentioned, it was nevertheless incumbent upon him to treat the agent with the same respect due him by the agent. Therefore, if, instead of so doing, he without provocation used insulting or opprobrious language to the agent, which naturally enough resulted in a difficulty, the company should not be held responsible."    Mr. Justice Lumpkin also said, in the case of *City Electric Ry. Co.* v. *Shropshire,* 101 *Ga.* 37 : " One who voluntarily, and by his own misconduct, places it beyond the power of a master to protect him, surely can not complain of an omission so to do. Especially is this true where he practically invites the master's

servant to disregard and abandon his official duties and enter into a personal encounter on his own account and upon his individual responsibility." See also *Georgia R. Co.* v. *Hopkins,* 108 *Ga.* 324.

According to the testimony of the plaintiff himself, he repeatedly persisted in driving his wagon within the cut next to the side-track,. which the agent insisted that he must not do, as it was in violation of a rule established by the company. Paying no heed to the repeated remonstrances of the agent, he sought advice from another employee of the railroad company, not shown to have had any connection whatever with the care of the station and ground, and then apparently defied the authority of the agent to compel him to desist from doing what he had been forbidden. Not only so, but he also subsequently left the car in which he was placing his wood, and sought the father of the agent, who was engaged in the same work some hundred yards down the track, for the purpose, as he states, of getting the father to tell his son not to go down there any more to disturb him, telling the father of the treatment which the son had given him. Then, at the request of the father, they both walked up to the warehouse, and the agent was asked by his father whether he had insulted the plaintiff, and receiving a reply that he had not, the father and the plaintiff became engaged in an altercation in which the agent participated. So that it is evident that plaintiff did not go to the warehouse at the time because of any business he had with the plaintiff as agent of the company, but for the purpose of adjusting a personal grievance; and if it was not adjusted in a manner entirely agreeable to him,. he should not attribute the fault to the railroad company. It was purely a personal matter between the three; and if the plaintiff has any cause to complain, it is against the individuals who inflicted the injuries upon him, and not against the railroad company, who at that time owed him no duty of protection. There was no error in the judgment awarding a nonsuit.

*Judgment affirmed. All the Justices concurring.*