## SAVANNAH ELECTRIC COMPANY *v.* WHEELER *et al.*

1. A street-railway company is liable for a tort committed by its conductor in the prosecution and within the scope of its business, whether by negligence or wilfully.

2. Where a petition alleged, that a conductor on the car of a street-railway company, while engaged in the prosecution and within the scope of his business in collecting fares, failed and refused to give a passenger correct change, and, upon request therefor, drew a pistol and fired at the passenger; but that the ball missed the passenger and struck a woman passing on the public street through which the car was running, causing her death; and that the plaintiffs were the husband and children of the decedent, the allegations set out a cause of action against the company, and the petition was not demurrable.

3. Allegations that the company knowingly placed in charge of one of its passenger-cars a conductor of bad character, who was drunk and armed with a pistol, and that a homicide occurred in the manner indicated in the preceding note, were not demurrable.

Submitted March 12,—Decided July 9, 1907.

Action for damages. Before Judge Cann. Chatham superior court. July 28, 1906.

Ferry F. Wheeler and Ferry F. Wheeler Jr., a minor, appearing by his father as next friend, brought suit against the Savannah Electric Company. The petition contained three counts. The first alleged, in brief, as follows: The defendant, a corporation, operates, maintains, and controls a system of electric street-railways, running in and through the streets of the City of Savannah, including a line of railway running through Broughton street in the City of Savannah, and did so on October 26, 1905. It was a common carrier of passengers over said line. On the afternoon of that day one of its passenger-cars was run and operated by two of its servants and agents, one of them being the motorman and the other the conductor. The conductor was the principal servant in charge of the car. He was drunk to such an extent that he was unable to properly perform his duties as conductor while collecting fares from the passengers. He was so unsteady upon his feet that he reeled from side to side of the car, and failed to make proper change for the passengers, in one instance giving pistol bullets for change. He failed and refused to give one of the passengers on the car the change that was due him, and, upon request to do so, with an oath he drew his pistol from his pocket and tried to shoot the passenger. The latter grabbed the pistol barrel and

scuffled with the conductor in order to keep from being shot. During the scuffle the conductor fired his pistol three times at the passenger. One shot struck the passenger, the other two missing him. One of them passed through the window of the car and struck Mrs. Wheeler, causing her death in a few minutes. At the time the bullet wound was received by her she was returning to her home on Broughton street, and was in the act of going up the steps of her house. At that time and place Broughton street was full of people passing and repassing, and any pistol-shot fired in the car, as was done by the conductor, was very apt to do injury or cause death to some person upon the street. The shot was not actually intended for Mrs. Wheeler, and was not fired at her. It was intended to injure the passenger on the car or to kill him, and it would have done so had he not grabbed the pistol in time to change the course of the shot. The passenger had paid his fare and had given no provocation whatever for the assault made upon him. There was no quarrel between him and the conductor, and no enmity existed between them; but the assault upon him by the conductor was due to the drunken condition of the latter. The conductor was in a drunken condition at the time he took charge of the car as conductor, and had so been for some time prior thereto. On account of his condition he was totally unfit to be put in charge of the car, and the corporation knew of his unfitness to run the car on that day, prior to the time of the shooting and in time to have prevented him from taking charge of the car and continuing to act as conductor thereof. Yet the company negligently permitted him to act for it as conductor of the car from the time it put him in charge, up to and including the time of the death of Mrs. Wheeler. One of the plaintiffs was her husband, and the other was her only child. The homicide resulted from the negligence of the defendant in permitting the drunken conductor, who was also armed, to its knowledge, to act as conductor of said car; and from the negligence of the defendant, through its conductor, in violating the duty it owed to the passenger. The direct cause of the death of Mrs. Wheeler was the bullet fired by the conductor, and this was a tort, an act of negligence attributable to the defendant. The pistol was also fired at a place where the car was being operated and run in a public street of the city, and such firing at that place was a violation of

the municipal law of the city which prohibited the discharge of firearms within the limits of the city. Broughton street is about 80 feet wide, and the street-car track runs down the middle of it. The distance between the conductor and Mrs. Wheeler at the time the pistol shot was fired was about 45 feet. There were also allegations as to the value of her life, and her capacity to earn money.

The second count differed from the first mainly in alleging, that the defendant negligently permitted the drunken conductor to act for it as conductor, from the time it put him in charge of the car on the day of the homicide, up to and including the time of the injury, knowing his condition and that he was armed; and that the homicide resulted from such negligence. It also alleged, that the defendant was negligent in failing to exercise ordinary care and diligence in the employment of the conductor to act for it; that he was an unfit and improper person for such employment, by reason of being habitually addicted to alcoholic liquors when on duty and being, while under such influence, a dangerous character who was apt to use his pistol, which he always carried when on duty, to the knowledge of the defendant; and that he had borne a bad record for a long time previous to his employment by the defendant, on account of his drinking habits. Several instances of his previous conduct were stated. It was further alleged, that on the evening in question he was drinking heavily at a resort at the terminus of the company's line, and was in a drunken condition on the car, within the knowledge of the conductor and motorman who then had charge of it; that he had been previously assigned to duty by the defendant, to relieve said conductor and take charge of the car when it should arrive at the shed in the City of Savannah and start on a tour through the streets for the purpose of carrying passengers; that it was the rule and custom of the defendant to inspect at said "car shed" the conductors and motormen who were assigned to duty as a relief crew to take the place of other motormen and conductors who had to be relieved. At that place conductors were "checked up" and their accounts handed in just prior to being temporarily relieved from duty. The place of inspection is where the cars pass about half a mile from the station and headquarters. At that place the conductor and motorman who had brought in the car from the terminus turned it over to their successors, one of whom was the conductor

who caused the injury. He was visibly so much under the influence of liquor that he was totally unfit to act as conductor. The company was also negligent in allowing him to take charge of the car at that time and place. It also was negligent in failing to have any inspection of him as to his fitness to run the car, and in failing to remove him from his position as conductor, prior to the time of the injury.

The third count briefly alleged, that the car was being operated by two of the agents of the company, one of them being the conductor, who was the principal agent; that on the car was a passenger who had duly paid his fare; that without any provocation the conductor assaulted him with a pistol; and that while shooting at the passenger, the conductor accidentally and negligently shot and killed Mrs. Wheeler, who was going up the steps of her home on Broughton street.

The defendant filed a general demurrer, which was overruled, and it excepted.

*Osborne & Lawrence,* for plaintiff in error.

*R. R. Richards* and *R. G. Richards,* contra.

LUMPKIN, J. (After stating the foregoing facts.)

The demurrer to the plaintiff's petition was overruled. It raised several questions.

1-2. Was the act of its conductor in shooting at the passenger attributable to the company, or was this the individual act of the conductor, for which the company was not responsible? "Every person shall be liable for torts committed by his . . servant by his command, or in the prosecution and within the scope of his business, whether the same be by negligence or voluntary." Civil Code, §3817. "Every corporation acts through its officers, and is responsible for the acts of such officers in the sphere of their appropriate duties." Civil Code, §1861. What was the master's business? Operating electric street cars as a common carrier of passengers. In its conduct of that business it was bound to use extraordinary diligence to protect the lives and persons of its passengers. Civil Code, §2266. Who was discharging this duty for the master? The petition alleges the conductor was so engaged. He was taking up fares not for himself but for the company. In doing this he had to make change. He failed and refused to give proper change to a passenger, and, when it was asked for, assaulted

the passenger with a pistol. The protection of the passenger, the collecting of fares, the giving of change, and dealing with passengers about these matters, were all in the prosecution and within the scope of his employment. But it is said that when he conducted this dealing, not properly by giving change, but improperly by shooting at the passenger, that was his individual tort, and the company was not liable. Many authorities state the liability of a master for the tort of his servant substantially as it is codified in our code. Expressions used in some reports and text-books, that a master is bound by the act of his agent or servant in the scope of his agency and in furtherance of the master's business, or when the servant is acting for the benefit of the master, do not mean that the agent's act must be beneficial to the master, or the latter is not bound. If any declare such a rule as that the master is bound by torts of the servant which benefit him, but not by any others, we can not accept it as the rule in this State. In this matter, as in some others, there has been an evolution in the law, arising from the growth and change in corporate life and activity, and the better study of them.

In *Central Ry. Co.* v. *Brown,* 113 *Ga.* 415, it was held, that "A master is liable for the wilful torts of his servant, committed in the course of the servant's employment, just as though the master had himself committed them. This rule applies as well where the master is a corporation as where he is a private individual. A railroad company is liable as a trespasser to a passenger for an unjustifiable assault made upon him by the conductor of the train, the conductor being engaged in the company's business and in the conduct thereof making such assault." And again: "Some of the courts seem at one time to have been inclined to hold that a master could not be held liable for the wilful torts of his servant, because, it was said, if the servant through anger or malice committed an assault upon a person, he ceased for the time being to occupy the position of servant, and acted independently; that, inasmuch as he was not authorized to commit an assault, he did not represent the master in that act but acted as an individual, the master therefore being not liable either in case or in trespass. This argument has long since been exploded. The theory that one may be a servant one minute, and, the very next minute, get angry, commit an assault, and in that act be not a servant, was too refined a dis-

tinction." In *Western & Atlantic Railroad* v. *Turner*, 72 *Ga.*
292, it was held that when a conductor maliciously assaulted one
who was treating with him for passage, he was acting in the pros-
ecution and scope of the company's business, and it was liable.
And see *Turner* v. *Western & Atlantic Railroad*, 69 *Ga.* 827. In
*Peeples* v. *Brunswick & Albany R. Co.*, 60 *Ga.* 282, where a decla-
ration alleged that a conductor called a passenger out of the train
of which he had charge and beat him, it was held to set out a cause
of action, and was not subject to a general demurrer. In Croaker
*v.* Chicago & Northwestern Ry. Co., 36 Wis. 657 (17 Am. R. 510),
it was said: "If one hire out his dog to guard sheep against
wolves, and the dog sleeps while a wolf makes away with a sheep,
the owner is liable; but if the dog play wolf and devour the sheep
himself, the owner is not liable. The bare statement of the prop-
osition seems a reductio ad absurdum."

In *Gasway* v. *Atlanta & West Point R. Co.*, 58 *Ga.* 216, a rail-
road company was held liable for a willful tort of a baggage-mas-
ter and conductor, committed upon one who was seeking to have
his baggage checked. The trial judge charged to the effect that
unless the act of defendant's agent tended to facilitate or promote
the business for which the agent was employed, the company was
not responsible, and refused to charge to the effect that the princi-
pal is responsible for the acts of its agents within the range of
their employment. This court said: "Railroad companies are re-
sponsible to passengers for the torts of the conductors and other
servants of the company employed in running trains, when such
torts are committed in connection with the business entrusted to
such servants and spring from or grow immediately out of such
business." This case has been often cited, but never reversed.
In Haehl *v.* Wabash Ry. Co., 119 Mo. 325 (24 S. W. 737), where
a bridge-watchman wilfully struck and shot a trespasser on the
bridge, it was held to be an act in the scope of his employment,
and that the company was liable. In Ramsden *v.* Boston & Al-
bany R. Co., 104 Mass. 117, it was held that a railroad corpora-
tion was responsible for an assault and battery by its conductor
upon a passenger, in seizing or attempting to seize his property to
enforce payment of his fare. In the opinion, Gray, J., said: "If
the act of the servant is within the general scope of his employ-
ment, the master is equally liable, whether the act is wilful or

merely negligent. . . The conductor of a railroad train, from the necessity of the case, represents the corporation in the control of the engine and cars, the regulation of the conduct of the passengers as well as of the subordinate servants of the corporation, and the collection of fares." In Barwick *v.* English Joint Stock Bank, L. R. 2 Ex. 259, 266, Willes, J., though using at one place the expression, "in the course of his master's business and for his master's benefit," evidently meaning merely in the discharge of the business entrusted to him, said (p. 266) : "It is true, he has not authorized the particular act, but he has put the agent in his place to do that class of acts, and he must be answerable for the manner in which the agent has conducted himself in doing the business which it was the act of the master to place him in." See also Daniel *v.* Petersburg R. Co., 117 N. C. 592 (23 S. E. 327) ; Texas Pacific Ry. Co. *v.* Williams, 62 Fed. 440; *Cole* v. *Atlanta & West Point R.·Co.,* 102 *Ga.* 474; *Savannah Street R. Co.* v. *Bryan,* 86 *Ga.* 312 (22 Am. St. R. 464) ; Patterson's Ry. Ac. L. 105; *Higgins* v. *Southern Ry. Co.,* 98 *Ga.* 751; *Southern Ry. Co.* v. *Chambers,* 126 *Ga.* 404; *Georgia R. Co.* v. *Richmond,* 98 *Ga.* 495.

It is contended that there is a difference between an assault on a passenger, to whom the company owes a duty of protection, and a wilful assault upon a stranger or mere passer having no relation with the company; and that the company is not liable for the latter. Cases of wilful assaults by an employee upon a mere stranger are not in point. The petition alleges that the conductor did not shoot at the woman killed. He shot at the passenger, and, missing him, hit the woman. Moreover, a railroad company's liability for the wilful torts of its agents acting in the scope of their business is not limited to torts on passengers. Some of the cases cited above are based on torts to trespassers, and persons not passengers.

What we think we have demonstrated is that; under the allegations of the petition, the conductor in dealing with the passenger and shooting at him was acting in the prosecution and scope of the business entrusted to him, within the meaning of the law. If he had hit the passenger, there could be no doubt that the shooting would have been within the rule. If he missed the passenger, did the shooting cease to be within the scope of his business? Shoot-

ing at another does not fall within or without the scope of the agent's employment according as his aim is good or bad. Bad marksmanship does not alter the status of the agent doing the shooting. If, then, the conduct of the conductor within the car was in law the conduct of the company, why was not the result of that same conduct, taking effect outside the car, also the result of the conduct of the company? It is not easy to see. But it is contended that, although there was an unlawful or negligent act relatively to the passenger, there was no violation of duty toward a passer on the street; and therefore no liability, although she was struck. It is a mistake to say that there was no duty toward passers on a public highway not to do wrongful or negligent acts which would naturally tend to injure them. In Fletcher *v.* Baltimore & Potomac Railroad Co., 168 U. S. 135, it was said: "A railroad company owes a duty to the general public, and to individuals who may be in the streets of a town through which its tracks are laid, to use reasonable diligence to see to it that those who are on its trains shall not be guilty of any act which might reasonably be called dangerous and liable to result in injuries to persons on the street, where such act could have been prevented by the exercise of reasonable diligence on the part of the company." In that case wood was thrown from a repair train by hands returning from work, and caused injury to one on the highway. The hands were not then engaged in the performance of their duties. But it was shown that the practice by the men of collecting refuse timber for firewood and throwing it off along the line near their homes had been going on for some time, and that the company was charged with notice of it, and acquiesced in it; or at least that it was a question for the jury; and that it was also for them to say whether the company exercised due care to prohibit the custom and prevent the performance of the act. A single act of this kind by a passenger, or an employee outside the scope of his business, would not suffice to charge the company, unless it had reason to anticipate the dangerous act and failed to use proper diligence to prevent it. But where the act is done by the agent of the company in the scope of his employment and while prosecuting it for the company, the single act is the company's act.

Again, it has been held that if in the performance of its business the company, through its agents, negligently sets in motion a

force which naturally and proximately causes an injury, it is liable. In *Fraser* v. *Charleston & Savannah R. Co.,* 75 *Ga.* 222, where wood negligently fell or was thrown from an engine and injured a person on a highway, the case was held to be one for the jury. See also *Savannah, Florida & Western Ry. Co.* v. *Slater,* 92 *Ga.* 391. In *Western & Atlantic R. Co.* v. *Bailey,* 105 *Ga.* 100, a petition alleged, that an engineer, while running a train, saw a trespasser in time to stop before striking him, but nevertheless "carelessly, negligently, recklessly, and wrongfully allowed and permitted" the train to run at a reckless and dangerous rate of speed, without any bell or whistle being sounded and without any effort to stop the train; that the engine struck the trespasser and hurled his body against an employee of the company, who was in his proper place performing his duties, and who was thus injured. It was held that a cause of action on behalf of the injured employee was set out. The ruling was put on the ground that "the negligence of the defendant put in motion the destructive agency, and the injury sustained by the plaintiff was directly attributable thereto," and did not rest on any duty arising from the relation of master and employee. Apparently the fact of employment was mentioned rather to show that the employee was rightfully at the place where he was. The principle involved in the case just cited was impliedly recognized in *Georgia R. Co.* v. *Wood,* 94 *Ga.* 124. In that case a boy who, with others, had previously been in the habit of swinging on trains attempted to do so on the occasion in question. He desisted, however, and ran off from the train into a private yard, where he was attempting to conceal himself. The brakeman on the train threw a stone at him. The stone, by accident, having missed the boy, hit and injured another person who was then on the same premises. It was held that no presumption arose that at the time of the throwing of the stone the servant was acting in behalf of the company or within the scope of his employment, as to anything then done or attempted to be done with a view to injure or affect the boy; and "consequently, the company is not liable for the injury thus done to the third person." Assuming that the employee had authority to keep trespassers off the train, the implication is that if he had been acting within the scope of his business at the time he threw at the boy, the company would have been liable to the third person.

In Alabama Great Southern R. Co. v. Chapman, 80 Ala. 615 (31 Am. & Eng. R. Cases, 394), the plaintiff, while walking on the track of the defendant's road, observed an approaching train, and got down on the edge of the embankment just before the train came along. A cow came up on the other side of the embankment and was thrown from the track by the engine, and bounced down, hit, and injured the plaintiff. The plaintiff was not seen by the engineer, owing to the embankment. There was some evidence tending to show that the engineer was negligent. It was held that if the animal was thrown from the track by the negligence of those in charge of the train, the injury to the plaintiff could not be regarded as a purely accidental occurrence for which no action would lie, but must be deemed to have been proximately caused by the negligence. In Quill v. New York Central R. Co., 11 N. Y. S. 80, a person was standing on a highway at a railroad crossing when a passing train collided with a coal cart, which was thrown forward upon him, inflicting injuries which caused his death. It was claimed that the collision between the train and the coal cart was due to negligence on the part of its servant in not giving proper and timely warning of the approaching train. A recovery in favor of the administrator of the decedent was sustained. In Jackson v. Galveston R. Co., 90 Tex. 372 (38 S. W. 745), a declaration alleged, that the plaintiff was repairing the track of the defendant railroad company; that the foreman sent an employee back to signal an approaching train; that the signal was given, but the train was not stopped, owing to the engineer's negligence or the insufficiency of the brakes; that as the train approached, plaintiff stood aside to escape it; that as it neared plaintiff, the fireman, to avoid danger which he properly apprehended, jumped from the engine against the plaintiff, and injured him. It was held that the negligence of the defendant was the proximate cause of the injury. The fact that the plaintiff was an employee appears, from the opinion, to have been stated in order to show that he was rightfully on the ground near the track. Denman, J., in speaking of the act of the fireman in leaping to escape danger caused by the negligence of the defendant or its engineer, said: "His acts, under the circumstances, are, in law, regarded as would be the movements of an inanimate object set in motion by such negligence." In Osborne v. Van Dyke, 113 Iowa, 557 (85 N. W.

784), an employee was holding a horse while the master applied some medicine to its neck. The horse jumped, and defendant began beating it with a heavy stick with a nail drawn through it, and, by reason of defendant's foot slipping, he unintentionally hit the plaintiff on the nose, causing injury. It was held that an instruction that the defendant would not be liable if in beating the horse he exercised reasonable care to avoid striking the plaintiff, and the blow which inflicted the injury was caused by an accidental slip, was erroneous, since the slipping of defendant's foot, being the consequence of his own wrongful act, was not an excuse for the injury. In 1 Addison on Torts (Wood's ed.), 4, it is said: "If the damage done is the immediate result of force exercised by the defendant, in a place where the probable and natural result of misdirected force would be to cause injury to others, the defendant will be responsible for the damage done, though it happened accidentally, or by misfortune, unless the force was used strictly in self-defense." In James *v.* Campbell, 5 Carr. & Payne, 373, Mr. Justice Bosanquet instructed the jury that if one of two persons fighting unintentionally struck a third, he was answerable in an action for assault, and the absence of intention could only be urged in mitigation of damages. In the celebrated case of Scott *v.* Shepherd, 2 W. Bl. 892 (1 Smith's Leading Cases (9th ed.), 737), it was held that an action for damages would lie for originally throwing a squib which, after having been thrown about in self-defense by other persons, at last put out the plaintiff's eye. There was some difference of opinion among the judges as to whether the proper form of action was in trespass or on the case.

Was the killing of Mrs. Wheeler the proximate result of the conduct of the company and its conductor? The definitions of proximate cause and proximate result in the text-books and reports vary very much in expression, and sometimes in idea. Professor Jaggard says that in determining what is a proximate and what is a remote consequence, the English courts incline to accept the measure of damages in cases of contracts, and to hold such damages as, (a) directly and necessarily result from the wrong complained of; (b) such further damages as should have been foreseen by the wrong-doer, in view of his knowledge, actual or constructive, of the special circumstances of the case. He asserts that the American courts do not seem to have determined very defi-

nitely whether the test is—(a). what a reasonably prudent man should have foreseen under the circumstances; (b) what follows as a natural result in the ordinary course and constitution of nature. 1 Jaggard Torts, 372. These two tests applied by the American courts may not be so far apart as they at first appear; since it would seem that what follows as a natural result in the ordinary course and constitution of nature ought to be foreseen by a reasonably prudent man. Section 3913 of the Civil Code, above quoted, in stating the rule, uses the expression "damages which are the legal and natural result of the act done," though contingent to some extent; but states that damages traceable to the act, but not its legal or "material" consequence, are too remote. The word "material" seems to be inapt, and as in the first part of the section the language is "legal and natural," it would appear to the writer that probably the word "material" originally found its way into the section by inadvertence or misprint, and that the same expression, "legal and natural," was intended to be used. This however, is merely conjectural.

In Atchison, T. & S. F. Ry. Co. v. Parry, 67 Kans. 515 (73 Pac. 105), it was held, that "negligence, to be the proximate cause of an injury, must be such that a person of ordinary caution and prudence would have foreseen that some injury would likely result therefrom, not that the specific injury would result." This is quoted approvingly in Western & Atlantic R. Co. v. Bryant, 123 Ga. 77-83. In Mayor and Council of Macon v. Dykes, 103 Ga. 847, 848, it was said, that "the rule is, that, in order to recover for an injury alleged to have resulted from the negligence of another, the injury must be the natural and probable consequence of the negligence; or, as otherwise stated, the wrong and resulting damage must be known, by common experience, to be naturally and usually in sequence. The damage, according to the usual course of events, must follow from the wrong. . . The principle in this State seems to be substantially the same." In 1 Shearman & Redfield on Negligence (5th ed.), §29, it is said: "The practical solution of this question appears to us to be that a person guilty of negligence should be held responsible for all the consequences which a prudent and experienced man, fully acquainted with all the circumstances which in fact existed (whether they could have been ascertained by reasonable diligence or not) would,

at the time of the negligent act, have thought reasonably possible to follow, if they had occurred to his mind." In Insurance Co. *v.* Boon, 95 U. S., 117 (p. 130), it is said: "The proximate cause is the efficient cause, the one that necessarily sets the other causes in operation. The causes that are merely incidental or instruments of a superior or controlling agency are not the proximate causes and the responsible ones, though they may be nearer in time to the result. It is only when the causes are independent of each other that the nearest is, of course, to be charged with the disaster." See also *Southern Ry. Co.* v. *Webb,* 116 *Ga.* 152; Thompson on Negligence, §59; St. Louis Ry. Co. *v.* McKinsey, 78 Tex. 298 (22 Am. St. 54).

3. It requires no argument to show that it was negligent to knowingly place a drunken conductor armed with a pistol, and of bad habits, in charge of a passenger-car, traversing the streets of a city; or at least that it should be left to the jury to determine whether this was not negligent. As matter of law, on demurrer, we can not say that this was not an act of negligence. It was contended that the homicide was not the natural and probable result of such act on the part of the company. But we know nothing more apt to endanger life and safety than to place in control of a passenger street-car the combination of a dangerous character, a conductor loaded with whisky, and a pistol loaded with powder and ball. In *Christian* v. *Columbus & Rome Ry. Co., 79 Ga.* 460, it was held that if a railroad company employed an agent and assigned him to duty with knowledge that he was insane, or of his being subject to sudden fits of insanity, it would not be excused from responsibility for a homicide committed by him while engaged in its business. See also *Central Ry. Co.* v. *Hall,* 124 *Ga.* 322; Kerlin *v.* Chicago R. Co., 50 Fed. 185; Williams *v.* Missouri Pacific Ry. Co., 109 Mo. 475 (18 S. W. 1098). If the company negligently assigned the conductor to take charge of the car, and, while acting in the general scope of the business entrusted to him, he wrongfully shot at a passenger, and as a proximate consequence thereof a person passing on the highway was killed, the company would be liable.

It is urged that the decision in *Belding* v. *Johnson,* 86 *Ga.* 177, is controlling as to liability not resulting from the placing of the drunken conductor in charge of the car. In that case it was al-

leged that a saloon-keeper sold and continued to furnish liquor to a person who was drunk, knowing that such person, when under the influence of liquor, was dangerous. The person so furnished shot and killed another while thus drunk. On demurrer it was held that the homicide was not the proximate result of the sale of the liquor. This differs materially from the present case. A mere sale of liquor to a drunken customer is not at all the same as knowingly to place a drunken employee, armed with a pistol, in charge of a car, with the duty of controlling it, dealing with passengers and conducting a part of its business. In Brazil v. Peterson, 44 Minn. 212, where a barkeeper assaulted a person who was in the saloon in an intoxicated and helpless condition, the court held that the proprietor of the saloon was liable.

What facts may be developed by the evidence we can not, of course, foresee, but the court properly overruled the demurrer and retained the case for submission to the jury on the evidence.

*Judgment affirmed. All the Justices concur.*