18881. MASSACHUSETTS COTTON MILLS *et al. v.* BYRD.

DECIDED JUNE 12, 1928.

*Willingham, Wright & Covington,* for plaintiff in error.
*Porter & Mebane,* contra.

LUKE, J.   J. W. Byrd sued Massachusetts Cotton Mills and John

242

Griffin for damages because of the alleged negligence of Griffin in driving an automobile into the automobile of the plaintiff. The jury found for the plaintiff, the defendants' motion for a new trial was overruled, and they excepted.

Though sharply conflicting, the evidence warranted the jury in finding that the collision was the result of Griffin's negligence; and, there being no special assignment of error, the only question for determination is whether or not Massachusetts Cotton Mills was liable for the acts of Griffin.

R. M. Gibbons testified that he was working for Massachusetts Cotton Mills as overseer of its yard at the time the collision occurred; that he had authority to hire and discharge labor, but not to hire automobiles, since the company had its automobiles and drivers; that the work was light in the yard and he sent Griffin out to the farm to work, but did not tell him to take his car there, and did not know that he was going to use it; that Jack Woodruff, who was foreman under the charge of the witness, came to him to get hands, and he consented for him to get John Griffin and others; that when he turned over hands to Woodruff he put them under his control, whatever he said was right; and that on the afternoon in question "they were under Jack's control and direction." After swearing that at the time of the collision he was in the employ of Massachusetts Cotton Mills, but had no authority to hire or rent automobiles for the company, Jack Woodruff testified as follows: "I know John Griffin. At the time of the collision he was working under me. I was with John in his car at the time of the collision. . . As to why I happened to be using Griffin's car at that time, we had caught up with the outside work, and we had lots of potato slips to set out, and Mr. Gibbons gave me some men to go to the potato patch and set out some slips, and I didn't have enough slips to set out till night, and Griffin had come to work in his car, and I asked Griffin if he minded taking his car and going up to the barn with me to get some potato slips, and he said, ' No,' and we got in his car and went and got the potato slips, and were coming back to the patch when we met Mr. Byrd in front of the mill office. . . This potato patch was between Lindale and Boozeville, that was the farm, being a part of the business carried on by the Massachusetts Mills, a part of its business down there. . . Those plants belonged to the Massachusetts Mills, and were being transported

from the hot-beds to the fields for the purpose of being planted by me as sub-foreman of the Massachusetts Mills. The method that I used for transportation was just this car, in order to hurry and get through before night." John Griffin testified: "I was working for the Massachusetts Cotton Mills, . . was hauling potato slips for the company. . . Mr. Jack Woodruff was looking after the potato-slip business. He sent me after the slips. . . I had been trucking cotton that morning up till dinner time. After dinner I helped set out potato slips. Mr. Bob Gibbons got me to do that, —quit trucking cotton and go and look after the potato slips. I went out to the barn of the Massachusetts Mills Company. I was driving my car, driving for them at the time, and on the way back was when the accident happened. Mr. Woodruff told me to get the car and go and get the potato slips. He went with me. . . The company did not have the car hired in any way. How I happened to be using the car at the time, I was working for the company and setting out potato slips, and they gave out, and sent me to get some. Mr. Jack Woodruff was with me in the car."

"Omitting the fellow-servant doctrine, the general rule is that the master is liable for the tort of his servant, whether negligent or voluntary, if done by his command or in the prosecution and scope of his business. Civil Code, § 4413. The expressions 'in the scope of his business,' or 'in the scope of his employment,' or similar words, have sometimes been given too narrow a meaning. A master rarely commands a servant to be negligent, or employs him with the expectation that he will commit a negligent or wilful tort; but if the act is done in the prosecution of the master's business, that is, if the servant is at the time engaged in serving the master, the latter will be liable. *Savannah Electric Co.* v. *Wheeler,* 128 *Ga.* 550, 553 et seq. (58 S. E. 38, 10 L. R. A. (N. S.) 1176). But for a tort committed by the servant entirely disconnected from the service or business of the master, the latter is not responsible under the doctrine of respondeat superior, although it may occur during the general term of the servant's employment." *Fielder* v. *Davison,* 139 *Ga.* 509, 511 (77 S. E. 618), 2 Blashfield's Cyclopedia of Automobile Law, 1384, lays down the law as follows: "The true test of whether or not a servant is acting within the scope of his employment is whether the servant, at the time of the injury complained of, is performing a service for the master in furtherance of

244

the master's business, not the method of its performance, nor whether it is done in exact observance of detail prescribed by the employer."

Applying the law to the facts of this case, we are of the opinion that the servant's tort was committed in the prosecution and within the scope of the master's business, and that the court correctly overruled the motion for a new trial.

*Judgment affirmed. Broyles, C. J., and Bloodworth, J., concur.*