## 27012. BROOME *v.* PRIMROSE TAPESTRY MILLS *et al.*

DECIDED DECEMBER 2. 1938.

*Lanham & Parker,* for plaintiff.
*Barry Wright, Jack Rogers,* for defendants.

MacINTYRE, J.   This was an action by Forrest Turner Broome,
by next friend, against Primrose Tapestry Mills and Billie Cooper
for damages growing out of an alleged unlawful assault on the
plaintiff by Cooper while acting within the scope of his employ-
ment with Primrose Tapestry Mills.   At the conclusion of the evi-
dence of the plaintiff, the judge, on motion, entered a nonsuit as to
Primrose Tapestry Mills.   Thereafter, on motion of the plaintiff,
a mistrial was granted as to the defendant Cooper.   The plaintiff
excepts to the judgment of nonsuit.

The evidence offered by the plaintiff in its material parts was as
follows:   Forrest Turner Broome testified:   "Some of my boy
friends and I had been down to the creek, and in coming back
crossed the property of the Primrose Tapestry Mills.   Mr. Cooper
had told us to stay off of the property and we had forgot about it.

. . I didn't see Mr. Cooper until I come back to the mill yard and he was driving out of the mill yard. . . He was in the truck and I hollered and said, 'What you say, Shorty?' and he got out and kicked me and twisted my arm, tore my shirt off of me, choked me, and struck me about the head, hitting the left eye. . . I had seen Mr. Cooper around the plant a good bit, and knew him. As I said, he had told me to stay off of the property, but did not say anything to me about crossing the property on this day. . . It was about a week before that when Mr. Cooper asked me to stay off of the mill property and stay in the road or path when I went down there. . . That first time when he asked me not to go on the mill property he was perfectly nice and polite about it. . . I . . just hollered out 'Shorty.' . . I said that just speaking to him. He didn't say anything to me, he come out of the truck and got his hand around my neck like I indicate, and kicked me and twisted my arm. He hadn't said anything to me before I hollered 'Shorty,'—hadn't said a word to me, nor any of the balance of them. When I hollered, 'Hello, Shorty,' we were then already down the road, and he was coming out the forks of the road, and he hollered and we stopped. I was not on the mill yard when he jumped on me. All he said was, 'Who said that?' He didn't say anything to me about being on the mill yard. . . He got out of his truck after I had hollered at him, 'Hello Shorty,' and came back and said 'Who said that?' And I said, I did, and then he grabbed me around the neck and choked me and kicked me. He didn't say anything at all to me about being on the mill property the day we had the scuffle, the scrap. . . When I hollered 'Shorty' at Mr. Cooper we were just out at the edge of the yard; he was going home then, just after four o'clock, leaving the mill. . . We were in the road, and wasn't even on the mill property unless the road is part of it. He passed me and didn't say a word to me until I hollered out 'Shorty.' "

Robert Savage testified: "We come across the grass and he told us to stay off of it, and so we started on and he got in the car and drove around the curve. He didn't say anything to us about staying off the grass or staying off of the mill property on the day this happened more than just this one time; it was that same day, he told us not to come across there any more. Then he got in the car and drove around the curve. This boy then called

him 'Shorty' when he got around the curve, and Mr. Cooper got out of the car and come around back there and we were making like we were playing cowboy, and we said 'Bam, bam,' and he come out and said 'Who said that?' and Forrest said it was he. He then kicked him and choked him and hit him in the eye and tore his shirt off. . . When I first saw Mr. Cooper he was right out there in front of the mill, fixing to get in the automobile, and he said to us not to come across the grass any more, and we didn't do anything but get off of the grass and come out to the road, and he got in his automobile or truck while we were walking on off. We had gotten up the road just before we got to the curve when he passed, which was as far as from here to the back of the court-room from where we were when he asked us not to get on the grass, about that far. . . When he passed us up there we just said 'Bam, bam,' just like we were shooting, and so he stopped the car and got out and said 'Who said that?' and Forrest said he did. . . We boys had gotten on off the grass before then, and had not gotten beyond the mill village; we were still in the mill village; we were right in front of the houses there, and on the public road:"

Harold McCain testified: "I first saw Mr. Cooper down there in front of the mill, fixing to get in the truck and go home. They got in the truck and come up and passed us, and we got up a little further there and we made like we were shooting at the truck. We did that by just holding up our hands, and made noise like we were shooting, just playing going up the road. Forrest called Mr. Cooper 'Shorty' at that time, and Mr. Cooper got out and come back and asked who done it, and Forrest said he did; and Mr. Cooper grabbed him by the neck and kicked him and choked him. . . He [Cooper] didn't say anything to us when we come across the grass, and we went on and got back in the road, and went about fifty yards from where I first saw him, up there around the curve, and we were in the road. Up to that time he never had said a word to us. He then passed us boys in his truck going out, and we were on the road and so was he, and when he passed him, Forrest hollered, 'Hello, Shorty.' That was not on the mill property at all, that was just on the road. When Forrest said 'Hello, Shorty,' I raised my hands up with fingers pointing at him and said 'Bam, bam.' He had already passed us on the road and the truck stopped and he got out and came back towards us, and said

'Who said that?' and Forrest just spoke up and said he said it. . .
When Mr. Cooper got to him he caught him by the back of the neck
and spanked him."

William Cooper testified: "My position with the Primrose Tap-
estry Mills is superintendent. My duties are to run the place in-
side and outside, to take care of it. As to whether those duties
require me to take care of the grounds of the company, we have a
watchman there day and night, but many times a watchman does
not see everything, and if I see any thing wrong I suppose it is
my duty to correct it. . . On this particular day I was leaving
the mill I saw those three boys cross over the far edge of the lawn,
and I says, 'Boys, you can't go down there.' That didn't make me
angry. I went back and told them 'If you must come down here,
will you please use the road,' and they went and got there. I
didn't take hold of this boy; he left, they were still on the lawn.
One of the boys didn't run, they were three together. That is all
I said to them. I made no effort to put them off of the ground. I
didn't take hold of the Broome boy and try to put him off the place,
neither did I try to put him in the truck and take him to town at
that time. I saw them there and told them to use the road and
not to walk over the flower beds and lawn, and the three boys were
together and they started off. Our car was stopped there and Miss
Bryson, Miss Washington, and Miss Bradshaw were in the car, four
of us. That was a Ford town car, and I got in it and started off,
and one of the boys passed a remark; that is what made us stop.
They didn't call me 'Shorty.' It sounded like 'a s. of a b.' to me
and that is the reason that we stopped. It sounded like that, I
couldn't say now that he did. I am hard of hearing a little. So I
went back. They hadn't gotten to the truck yet; they were still on
the ground there. As to whether I went back to get them off of
the ground, and not because they said something to me, I didn't
know whether they were going to stay there or not. I didn't try
to put any of them off of the ground at that time; I went back to
find out what the boy said. I had the truck stopped and went back
and in five feet, it had just started. The boy didn't then promptly
tell me he had called me 'Shorty,' he didn't say anything about
'Shorty.' That is the first time I heard the word, is to-day. It
might be that those boys were just playing like cowboys and saying
'Bam, bam,' and shooting, but there has been so much stuff de-

stroyed down there in the last two years. As to whether that is the reason I went back on account of stuff being destroyed and to get the boys off the property, I didn't want that to happen on the property, and I didn't want them to walk between the office and the mill because there was flowers there and the lawn. I didn't go back on that account; I went back to see what the boy said. I didn't go back to see why they were staying there on the company's property. I heard him make a remark; I was going to boot him, but I didn't do that, I was going to give him a boot off. I didn't take hold of him and didn't have hold of him right at this point. Right at this point he picked up a rock and when he did I caught hold of his shirt and collar and I says, 'I am going to take you off the place,' and I took him about ten or fifteen feet and he says, 'I am sorry,' and he dropped the rock and I let him go, and the three boys came up the road together back of us."

Where a wilful and unjustified assault is committed by a servant within the scope of his employment, the master is liable for the injury thus inflicted under the doctrine of respondeat superior. *Gomez* v. *Great A. & P. Tea Co.,* 48 *Ga. App.* 398 (172 S. E. 750), and cit.; *Central of Ga. Ry. Co.* v. *Brown,* 113 *Ga.* 414 (38 S. E. 989, 84 Am. St. R. 250); *Savannah Electric Co.* v. *Wheeler,* 128 *Ga.* 550 (58 S. E. 38, 10 L. R. A. (N. S.) 1176). On the other hand "if a servant steps aside from his master's business, for however short a time, to do an act entirely disconnected from it, and injury results to another from such independent voluntary act, the servant may be liable, but the master is not liable." *Savannah Electric Co.* v. *Hodges,* 6 *Ga. App.* 470 (65 S. E. 322). While it is true that whether the servant was acting within the scope of his employment at the time of the alleged assault is generally a question for the jury, yet where it is plain and palpable that at the time of the assault he was not so acting, this court may so determine, as a matter of law. In the present case it seems to be manifest from the testimony of the plaintiff's witnesses that the real purpose of the conduct of the servant Cooper, in making the assault upon the plaintiff, was to satisfy personal resentment and anger for the abuse and disrespect which he thought the plaintiff guilty of towards him, and was not done in carrying out any object of his employment. In such instance, he was not acting within the scope of his employment, and the master, Primrose Tapestry Mills, can

not be held responsible for his acts. *Atlanta Coca-Cola Bot. Co.* v. *Brown,* 46 *Ga. App.* 451 (167 S. E. 776) ; *Lynch Co.* v. *Fla. C. & P. R. Co.* 113 *Ga.* 1105 (39 S. E. 411, 54 L. R. A. 810) ; *Atlanta Baseball Co.* v. *Lawrence,* 38 *Ga. App.* 497 (144 S. E. 351) ; *Georgia Ry. & Bkg. Co.* v. *Richmond,* 98 *Ga.* 495 (25 S. E. 565) ; *Dugger* v. *Central of Ga. Ry Co.,* 36 *Ga. App.* 782 (138 S. E. 266) ; *Henderson* v. *Notting First Mor. Cor.,* 184 *Ga.* 724 (193 S. E. 347, 114 A. L. R. 1022) ; *Daniel* v. *Excelsior Auto Co.,* 31 *Ga. App.* 621 (121 S. E. 692) ; *Georgia Ry. & Bkg. Co.* v. *Wood,* 94 *Ga.* 124 (21 S. E. 288, 47 Am. St. R. 146) ; *Smith* v. *Seaboard Air-Line Ry.,* 18 *Ga. App.* 399 (89 S. E. 490) ; *Heath* v. *Atlanta Beer Dist. Co.,* 56 *Ga. App.* 494 (193 S. E. 73).

It is true, according to the testimony of the plaintiff and his companions, that immediately before the assault he had been trespassing on the property and walking on the grass contrary to the orders theretofore given him by Cooper; and, according to Cooper, that they were still on the property at the time of the assault, and that Cooper was the superintendent of the mill and the property, with authority to protect the same from trespassers; but it is manifest from all of the testimony that Cooper did not object to, or feel it his duty to evict the plaintiff from, his position in the road where he was standing with his companions when Cooper passed them in an automobile, but that he became incensed upon the plaintiff casting what he thought to be a disrespectful remark at him, and that he thereupon stopped the truck and went back to the place where the plaintiff was standing, and after ascertaining that the plaintiff was the one who made the remark, assaulted him. His state of mind and his purpose are made crystal clear by the only remark which he made after getting out of the truck and walking back up the road to the place where the plaintiff and his companions were standing, which was: "Who said that?" He apparently was not interested or concerned in the fact that the plaintiff and his companions had been on or were trespassing on the property of his employer, but intended only to and did direct his entire attention to the one of the boys who had made what he thought was a disrespectful remark. The fact that Cooper, during the assault, may have attempted to or did evict the plaintiff from the property, or that the assault may have had the effect of deterring the plaintiff from future acts of trespass, can, as we see it, make no difference

under the facts of the present case, for the assault was plainly the result of his personal anger and resentment of the conduct of the plaintiff, which conduct was personal to Cooper and had no relationship to his employment.

In the case of Illinois Cent. Ry. Co. *v.* Ross, 31 Ill. App., 170, it appears that a flagman of the railway company at a street crossing, exasperated by the abusive language of a boy, threw a lump of coal at him while he was on the premises of the company. The court said: "The proof is clear, that before he threw the coal Tucker had done and ended all that he supposed to be his duty or intended to do on account of anything the plaintiff had done affecting the company. He had actually turned away from the scene of the difficulty, and was going back to his place on the street, without any attempt or any show of purpose to remove anybody from these grounds, when the new provocation, having no relation to the company or any of its affairs, induced the wrongful act in question. Manifestly it was not done to clear the right of way, nor otherwise in furtherance of appellant's business, but in purely personal resentment of a purely personal affront. . . Then, if everything previously done by Tucker had been within the line of his employment, and the act in question in fact grew out of it, and would not have been done but for what had previously been so done, still, if it was separated from all that preceded, and clearly distinguishable as to time, motive, and object, and was on purely personal account of the servant, the company would not be liable for it upon any authority implied from its relation to him." We think this language peculiarly applicable to the present case. See also Chicago & A. R. Co. *v.* Randolph, 65 Ill. App. 208; Johanson *v.* Pioneer Fuel Co., 72 Minn. 405 (75 N. W. 719).

For the above reasons we are of the opinion that the court did not err in awarding a nonsuit.

*Judgment affirmed. Broyles, C. J., and Guerry, J., concur.*