EDWARD H. BREVIG v. CHICAGO, ST. PAUL, MINNEAPOLIS & OMAHA RAILWAY COMPANY.[1]

February 7, 1896.

Nos. 9678—(278).

**Railway—Ejection of Trespasser—Authority of Brakeman.**

*Held*, a freight-train brakeman has implied authority to eject trespassers and apparent trespassers from the freight cars of the train.

**Same—Joint Trespasser.**

But, where a person bribed such a brakeman to permit him to ride among the freight in a freight car, *held*, the brakeman and such person thereby became joint trespassers, and the brakeman's implied authority to represent his employer in ejecting such person thereby ceased, so that, unless it appeared that the brakeman had received subsequent express authority to eject such person, his act of doing so in an improper manner was simply the assault of one joint trespasser upon another, and not the act of the railway company.

**Same.**

This is true, even though the conductor had, in the meantime, discovered such person in the car, and locked him in the same, and he continued to be so locked in the car until such brakeman unlocked the door, and so ejected him.

**Evidence Applied.**

On the evidence in this case, *held*, the plaintiff was not a passenger, but a joint trespasser with the brakeman who let him into the car.

**Same.**

But, whether the brakeman who let him into the car was the same one who drove him out was, on the evidence, a question for the jury.

**Same—Contributory Negligence.**

Whether plaintiff was compelled, by force, to jump from the train, or whether his act was so far voluntary that he could be guilty of contributory negligence, and whether he was guilty of contributory negligence in jumping from the train, were, on the evidence, all questions for the jury.

[1] Reported in 66 N. W. 401.

Appeal by plaintiff from an order of the district court for Hennepin county, Smith, J., denying a motion for a new trial. Reversed.

*John W. Arctander* and *Ludvig Arctander*, for appellant.

*Thomas Wilson* and *L. K. Luse*, for respondent.

CANTY, J.    Plaintiff claims damages from defendant in this action on the ground that, while a passenger on one of its railroad trains, he was by threats of bodily violence, to him made by one of defendant's servants, in charge of the train, and while the train was in motion, compelled to jump from the train, by reason of which he was run over, and one of his arms crushed under the wheels, so that it had to be amputated.    On the trial a verdict was ordered for defendant, and from an order denying a new trial plaintiff appeals.

On the trial plaintiff testified that he and one Hanson left Minneapolis, May 8, 1894, to go to Lake Crystal, and walked out along the line of defendant's railroad as far as Hamilton.    There he found a passenger train and a freight train, both going toward his destination.    It was after dark in the evening.    They saw a man at the freight train.    Said the witness: "He asked us if we were going out West, and Hanson said we were going to Lake Crystal, and the man said he would take us there for 50 cents apiece.    He was a trainman.    I know he was a trainman, because he had gloves on his hands, and carried such a lantern as trainmen generally carry.    We paid him 50 cents apiece.    He put us in a box car full of machinery."    On cross-examination he testified: "I did not ask the man to show me the caboose.    He told us to go into the box car.    *    *    *    The man took us up to the box car, and let us in through the end door.    I don't know how big the end door was. We had to climb up on the bumpers to get in.    The trainman opened the door for us, and we crawled in.    It was rather dark in there.    There was much machinery in there.    The trainman shut the door after us, but did not lock it, he left it a little open.    Hanson and I did not go to sleep.    I stood up there all the time.    *    *    * I saw the caboose of the train.    I did not go back to it.    The train was made up of freight cars, except the caboose."    "We did not

take the passenger train, because the trainman came around just then, just as we were going to the station to buy a ticket. He told us we could go on the freight train, and he charged us 50 cents apiece. I took this freight train, instead of the passenger train, because, when the man came and told me to, I thought it was all right, because I had never gone on this train. I had gone on passenger trains before. I would not rather ride in a box car filled with machinery than in a passenger coach; but I thought it was all right, when a person paid for it, and the trainman came and took you up. I did not think that it was cheaper, but I had heard there was three classes of tickets. * . * * I had never bought any different classes of tickets in this country before. * * * There were no seats in this box car. The machinery in there were binders and mowers. I did not think that it was a proper place for passengers." "I did not know, for sure, what the fare was from Hamilton to Lake Crystal. I thought it was about $1.80."

He further testified: "When we had come as far west as Minneopa Falls the trainman came in. He told * * * us to go out. He opened the door, and then said he was going to keep us in the car. * * * He had a lantern in his hand. He said he would keep us in the car until he found out how we got in there, and he asked how we got in there. He first said we should go out. Then we were ready to go out, and he shut the door, and told us to stay there until he came in. He shut the door so we could not get out. When he told me to go out, I said to him I had paid 50 cents to get to Lake Crystal; but I said that did not cut any figure, and we were ready to go out, and we started to go out, when the door was shut. We tried to open the door two or three times, but there was a bar on the outside so we could not open it. Then the train started up again, and when we had run about one mile from the station, a man came and opened the door, and told us to get out. That was a trainman. He said we should get out, and that quickly. He swore. * * * My partner jumped first. The man stood with a coupling pin in his hand, and told me to get out; told me to get out, and jump. He said he would kill me. He had plenty of men on the train to get me out, if I did not go out. When he threatened to kill me, I was afraid he was going to knock me in the

head; and, of course, I jumped out, and then the wheels ran over my left arm." Further evidence was given as to the identity of the trainman, or different trainmen, who took part in these transactions. Evidence was given, on behalf of plaintiff, tending to prove that the trainman who took the 50 cents apiece from plaintiff and Hanson was the same one who locked them in the car, and afterwards drove them out, and compelled them to jump off the train. Evidence was also given, on behalf of plaintiff, tending to prove that one trainman put them in the car, another locked them in, and still a different one drove them out. Evidence, so given, also tended to identify the conductor of the train as the man who locked them in the car. The evidence introduced by plaintiff was contradictory and confusing as to these matters. The conductor was called as a witness, and denied that he locked these parties in the car, or that he had any knowledge that they were on his train until after plaintiff was injured. This is all of the testimony which it is necessary to state.

We are of the opinion that plaintiff's claim that he was a passenger is wholly untenable. Neither can any weight be given to his claim that he was so ignorant of the ways of the country, or of any other civilized country for that matter, that he did not know that a passenger of any grade would not be carried by a railway company stowed away in the dark in a freight car filled with freight. This question was lately before us in the case of Janny v. Great Northern R. Co., 63 Minn. 380, 65 N. W. 450, and we so held. We must hold, as a question of law, from the testimony, that plaintiff was simply a joint trespasser with the brakeman whom he bribed to violate his duty to his employer.

As we have already stated, there was evidence tending to prove that, while the train was standing on the track at Minneopa, the conductor locked the plaintiff in the freight car, and that he was then carried to the point where he was compelled to jump off the moving train. It is claimed by plaintiff that this constituted him a passenger, and imposed on defendant the high degree of care for his protection which is imposed on it for the protection of other passengers. We are of the opinion that such a prisoner is not a passenger, in any proper sense of the word. The defendant could

still eject the plaintiff in any proper manner, at any proper time and place, and he would not have a cause of action against it for being thus released and ejected. But, whether rightfully or wrongfully a prisoner (a question not argued), he would certainly be entitled to a much higher degree of care for his protection than would a mere trespasser not thus in custody; and the defendant would be liable for the wrongful act of its brakeman in ejecting him in an improper manner. But, even though the plaintiff was not thus in custody at all, but continued to be, what he originally was, a mere trespasser, we are of the opinion that the defendant is liable for the wrongful act of its brakeman in ejecting him in an improper manner, unless the brakeman who did so was the one who let him into the car.

This brings us to the principal question in the case. Has a brakeman on a freight train implied authority to eject a trespasser or apparent trespasser? There is a conflict in the authorities on this question, but we are of the opinion that he has such authority. It seems to us that correct reasons for holding he has such implied authority are given in Patterson, Ry. Acc. Law, § 111. After stating that some of the cases hold that a brakeman has not such authority, it is said: "The doctrine of most of the cases, however, is that, wherever a railway servant is put in charge of any property of the railway, as a station master in charge of a station, or a conductor in charge of a train, or an engine driver or fireman in charge of an engine, or a brakeman in charge of a car, that servant is necessarily charged with the duty of protecting that particular property, and he is, therefore, for that purpose, vested with an implied authority to remove trespassers therefrom; and if he makes a mistake, either by removing a person who is rightfully therein or thereon, or by using unnecessary violence in the removal of a trespasser, the railway must be held liable for all such injuries as result, in the one case from the removal, and in the other case from the unnecessary violence with which that removal is effected." While the authority of a freight-train brakeman is quite limited, his duties do not consist merely of turning the brakes. By universal custom he has police duties as to the cars immediately under his charge. As said in Hoffman

*v.* New York C. & H. R. R. Co., 87 N. Y. 25, 31: "The implied authority in such a case is an inference from the nature of the business, and its actual daily exercise, according to common observation and experience." "Suppose a train was standing still, and a trespasser was put off by force by a brakeman, using no unnecessary violence; would it not be a good defense to an action against him for the assault, that he was a brakeman, and did the act complained of in that capacity, although without express authority?" [2]

But we are also of the opinion that the brakeman, who conspired with plaintiff to commit a trespass against defendant, had no implied authority, subsequently, to represent defendant in ejecting plaintiff, and that, if he was the brakeman who did eject plaintiff, it was simply the assault of one joint trespasser upon the other, for which defendant is not liable. This is true whether the conductor had locked the plaintiff up or not. By plaintiff's own procurement, the brakeman had ceased to be the disinterested servant of the defendant, or, as far as that transaction was concerned, its servant at all. His motive in driving plaintiff off the train while in motion might have been, not to serve his master, but to cover up his offense against his master. If there is any doubt as to that, the doubt must be resolved against the wrongdoer. Plaintiff and the brakeman became joint trespassers at the beginning of the transaction, and it must be presumed that they continued such to the end. The brakeman's implied authority to represent the defendant in ejecting his confederate had ceased; and if he was subsequently given express authority to eject him, the burden was on plaintiff to prove it. Then, if the same brakeman whom he bribed to let him into the car drove him out of it, he is not entitled to recover. But, whether or not it was the same brakeman, or another brakeman, was, on the evidence, a question for the jury.

Whether plaintiff was compelled, by force, to jump from the train, or whether his act was so far voluntary that he could be guilty of contributory negligence, and, if so, whether he was guilty of contributory negligence in jumping from the train, were, on the evidence, all questions for the jury.

The order appealed from must be reversed, and a new trial granted. So ordered.

[2] Id., at page 30.

On Petition for Rehearing.

February 20, 1896.

PER CURIAM. The application for a reargument of this case is mainly based upon the ground that the court overlooked and failed to consider the evidence of the conductor of the train that no brakeman had authority to eject trespassers; that, on the contrary, the exercise of any such authority by brakemen was expressly forbidden by the company. It is assumed that we have decided, not only that (a) the duties of a brakeman upon a freight train are such that, in the absence of evidence showing the scope thereof, it will be presumed that he has implied power to remove trespassers from the train, but also (b) that this will be conclusively presumed, even against the uncontradicted evidence that no such power was conferred, but, on the contrary, expressly withheld, and its exercise forbidden, by the railway company. Although the testimony of the conductor was very briefly referred to in defendant's statement of facts, it was not once alluded to in either the printed or oral argument, but the case was argued exclusively upon the question whether implied authority on part of brakemen to eject trespassers is to be presumed from the nature of their employment. This question we answered in the affirmative, but the further question, whether this presumption was conclusive, or whether it might be rebutted by evidence affirmatively showing that such authority was expressly withheld, or its exercise forbidden, was not considered or decided by us.

A railway company owes trespassers no contract duty. Neither are trespassers in a position to invoke the doctrine of apparent authority. They can only, under any circumstances, hold the company liable for acts of its agents or servants done within the scope of their actual authority, either express or implied. Therefore, while we are of opinion that the general duties of brakemen are such that their implied authority to eject trespassers will be presumed, yet we are also of opinion that as to a trespasser, which plaintiff clearly was, this presumption may be rebutted by evidence showing that such authority was expressly withheld, or its exercise forbidden; and, if that fact was established, the defendant

would not be liable to the plaintiff for the acts of its brakeman in ejecting him from the train. How strong or complete this evidence should be, in order to make the question one of law, for the court, instead of one of fact, for the jury, it is unnecessary now to consider, further than to say that, in view of the general nature of the occupation of brakemen, the evidence that authority to eject trespassers had been expressly withheld or forbidden should be clear and full, in order to overcome the presumption of the existence of such implied authority. The testimony of the conductor of this particular freight train was the only evidence on the subject. It did not appear how long he had been in the employment of the defendant, or what was the extent of his knowledge of the rules of the company or of the general usage on its trains. The "bulletin" of the company to which he referred was not produced. No general officer of the company was called as a witness. In view of all these circumstances, we are of opinion that, although the testimony of the conductor was not contradicted, yet the question of the authority of the brakeman to eject the plaintiff was one for the jury.

Application denied.