# FRANK PENAS v. CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY and Another.[1]

September 9, 1910.

Nos. 16,409—(153).

### Liability of master to third persons for tort of servant.

In its early history, the law as to the liability of the master to third persons for the tort of his servant passed from holding the master absolutely liable to holding him liable in case of particular command only. Later the liability was enlarged, and determined by general authority, express or implied, and was subsequently extended so as to result in the rule that the master is responsible for the tort of his servant, done in the scope of his authority with the view to the furtherance of the master's business, and not for a purpose personal to himself, whether committed negligently or wilfully and in excess of his authority or contrary to his express instructions. The English courts now recognize a still larger responsibility in cases where the wrong complained of was not within the scope of the servant's authority, but was done in the course of employment. The American cases have correspondingly extended the master's liability, and have considered it, not only from the master's point of view, but also from that of the person injured, and have placed emphasis, not so much on authority, real or apparent, as upon the violation by the servant of the duty owed by the master to the person complaining.

### Same — when he is liable.

Liability may attach to the master under one or more of two different classes of circumstances, namely, first, by virtue of personal commission, singular or joint, or by consent before or after the wrong; and, second, by virtue of relationship subsisting between the master and the person injured, or because of creation, ownership, custody, or control of instrumentalities intrinsically or potentially dangerous, or where the master's conduct, his implements and premises and facilities for doing business, or the course of his business generally, or of dealing with the party complaining, have a natural tendency to create, or to determine the extent of, damage involved; or by estoppel. Many reasons, often divorced from the resulting standard, concur in imposing liability on the master.

[1] Reported in 127 N. W. 926.

**Personal culpability — public policy.**

The master's responsibility in the first class of cases rests on personal culpability through participation or authority, including ratification. In the seond class of cases it is largely independent of personal fault, and rests essentially on reasons of public policy, the principal ones of which are here referred to.

**Uncertainty of meaning — "authority" — "course of employment."**

The equivocation and uncertainty of the terminology of the subject is, necessarily a prolific source of inconsistency in decision.

Authority is used in the sense of (1) real or actual authority, express or naturally implied; (2) fictitious or imputed authority, of which (3) apparent authority is really one variety.

Scope of authority and course of employment, and their congeners, are often used indiscriminately and interchangeably, and sometimes as representing, respectively, the more restricted and the more enlarged and usually the most enlarged criterion of liability of the master.

**Dependent on proof of damage resulting from the wrong.**

The master's liability is conditioned on proof of damage consequent on the wrong committed by one who at the time is a servant of the master and under such circumstances that liability is attached to the master under the criterion prevailing in the jurisdiction and appropriate to the circumstances involved.

**Test of liability.**

Liability may attach under the test of authority, the test of motive and benefit, or the test of duty violated. No one rule of liability is the sole or invariable standard. Different specific torts, or the same tort committed under different circumstances, may involve the application of different principles.

**Liability a question for the jury.**

Plaintiff's minor, who was really, but not apparently, a trespasser, claimed to have been thrown from a moving train by defendant's brakeman and injured. It is *held* that defendant's liability was for the jury, under proper instructions from the court. Barrett v. Minneapolis, St. P. & S. S. M. Ry. Co., 106 Minn. 51, followed and applied.

Action in the district court for Ramsey county by plaintiff, by his guardian, against defendant company and William Keys, to recover $50,000 for personal injuries sustained by being forcibly ejected from defendant's train.

The complaint among other things alleged that on February 26, 1907, plaintiff was desirous of riding to Western avenue on the train.

of defendant company, boarded the train at the Union Depot in St. Paul and was received upon the train as a passenger; that William Keys, a brakeman, approached plaintiff and stated in a loud voice "get off this train, * * * or I will throw you off;" that plaintiff tried to reason with the brakeman, whereat the latter repeated his language and then gave plaintiff a violent push, throwing plaintiff into the open gap between the platforms with the result that he fell to the rails of the track and the moving train passed over his right arm and his left hand and otherwise severely injuring him; that the injuries were caused directly by the joint negligent acts of both defendants and their failure to use proper care toward said plaintiff. The answer was a general denial. The case was tried before Olin B. Lewis, J., and a jury which returned a verdict in favor of defendants. From an order denying plaintiff's motion for a new trial, he appealed. Reversed.

*D. J. Keefe* and *Thos. C. Daggett,* for appellant.

*F. W. Root* and *Nelson J. Wilcox,* for respondents.

JAGGARD, J.

For present purposes it will be assumed that plaintiff and appellant's minor was really, though not apparently, a trespasser on defendant's passenger train. Plaintiff's contention was that a brakeman struck or pushed him from one of its cars while in rapid motion, so that he fell to the ground in such a way as to have his right arm and part of his left hand severed. The jury found for defendants. This appeal was taken from the order of the trial court denying plaintiff's motion for a new trial.

## I.

This case involves a constantly recurring confusion in the law as to when a master is liable to third persons for the tort of his servant. That confusion is perhaps greater than in any other corresponding branch of our jurisprudence. The multiplication of authorities has not tended to clarify, but to obscure, the subject. Usually a decision on the subject consists of an imperfect collation of the more or less

nearly related cases, without consideration of opposed opinions, and without inquiry into the status of the rule in history or in reason. One which contains even a bird's-eye view of the principles involved is a rarissima avis. It has, indeed, become practically impossible to review all the decisions on the subject generally, and difficult even to refer to the opposed authorities on a particular point in issue.

The rules themselves originated from the law of master and servant and the law of principal and agent indiscriminately, at a time when torts as a general subject was practically unknown. In consequence their development has been largely, but not entirely, independent of many other necessarily related subjects. That evolution, however, has been in many respects radical. It is often ignored, and more often confused. Overruled cases and cases overruling them are constantly cited by eminent judges and writers as authorities and reason for the overruled proposition itself, and almost as often for an inconsistent principle which has been repudiated times without number. In almost every state of the Union three or four stages of evolution will be found irreconcilably confounded. Current judicial language is a tessellation of the terminology of each of those stages.

It is impossible within the necessary limits of this opinion to state all pertinent considerations, or to discuss or even refer to any considerable portion of the authorities. At various times practically all the relevant decisions and discussions have been examined. It is feasible here to attempt to state only a small part of the results of that examination applicable to the facts here in issue.

## II

This confusion has arisen primarily from failure to apprehend the historical development of the subject. It is elementary that the law as to when the master is liable to third persons for the tort of his servant has passed through many stages of development. These may conveniently be thus stated:

1. The earliest theory recognized the absolute liability of the master. This survives in few cases only, as where the master is held to have insured safety.

2. It then came to be recognized that the master was liable only in cases where he had given a particular command to his servant to commit the wrong complained of. This period is treated as beginning about the time of Edward I., 1300.

3. During Lord Holt's time (about 1700) the rule was widened, so as to impose liability on the master for his servant's conduct in pursuance of general authority, express or implied. Blackstone recognized this as the criterion. His teaching, correct at the time, but inconsistent with the subsequent trend of decisions, has been followed, and is constantly to-day regarded as the law by both commentators and courts.

4. In Lord Kenyon's time (1800 et circa), the master's responsibility was greatly enlarged, so as to give to implied authority a wide meaning, including cases within the "sweep" or "apparent scope" of authority, in order to embrace cases of authority, express or implied, and also cases of mistaken and excessive execution of authority. The master was held responsible, even if he had specifically forbidden the servant's conduct and the servant had acted wilfully and maliciously. The essential criterion became whether the conduct was in furtherance of his employment and for the benefit of the master.

(The superiority of American scholarship on this subject will be demonstrated by a comparison of Mr. Wigmore's invaluable article in 7 Harvard L. Rev. 383, et seq., with the English review of this history in Macdonell, Master & Servant, 263.)

The transition in thought between the third and fourth stages of development is well illustrated by contrasting the familiar and leading cases of McManus v. Crickett (1800) 1 East, 106, and Limpus v. London (1862) 1 Hurl. & C. 526.

This rule has been subject to much criticism. It has been repudiated as a universal or invariable rule by practically all of the American courts. The English judges, absorbed in the contemplation of the law of master and servant and of principal and agent, appear to have been oblivious to the relation between the master and the person injured, necessarily involved, and to other considerations which in other, but similar, cases, are judicially recognized as controlling

in analogous situations. In particular they have overlooked the increasing stress the progress in their own law has placed upon responsibility for the violation of duties recognized by law.

Thus there are duties to third persons so far nondelegable as to render the employer liable in damages for their breach, although the immediate cause of the harm complained of is an independent contractor, as in nuisance cases (and see Williams, J., in Pickard v. Smith, 10 C. B. [N. S.] 470, 480, Penny v. Wimbledon, L. R. [1899] 2 Q. B. 72, Winslow v. Commercial [Iowa] 124 N. W. 321), or a stranger (Illedge v. Goodwin, 5 Car. & P. 190, et sim.) Under analogous facts, not distinguishable on principle, the master has been exonerated from responsibility for the tort of his servant. On the same principle, a total stranger to a contract may recover damages in tort from the manufacturer or contractor who has been guilty of negligence in connection with the delivery of potentially dangerous instrumentalities to his servant. Parry v. Smith, 4 C. P. D. 325, 327. And see later cases collected and discussed in O'Brien v. American Bridge Co., 110 Minn. 364, 125 N. W. 1012. The basis of the liability is a breach of duty. Clerk & Lindsell, Torts (Can. ed.) at page 465. So, also, a master owes his servant duties which are nondelegable on proof of the breach of which by another servant the master is liable, irrespective of the motive of the servant.

Apart from its inconsistency with these and other lines of authorities, the English criterion fails in reason because it primarily rests on the state of mind of the servant. This is often in fact a remote, accidental, and collateral circumstance. 1 Thompson, Negligence, (2d Ed.) 553, 554. The test is artificial and metaphysical. The saving grace of a sense of humor is obviously wanting. See, e. g., Beven, Negligence, preface, and Macdonell, Master & Servant, 242.

It is usual, but not accurate, to regard the progress of the English law as having stopped at this point. Exactly what is the present English criterion is not clear, but (Mr. Beven to the contrary) it inclines to follow the reasoning of American courts and to extend further protection to third persons. The difficulties in the situation have led the English courts to yield to "the modern tendency to extend the master's responsibility to acts naturally flowing from the employment thereof not within its scope." Ruddiman v. Smith

(1889) 60 L. T. R. (N. S.) 708 (where the servant negligently allowed water taps in a lavatory to run, plaintiff was damaged by the overflow, and the master was held liable. Cf. Stevens v. Woodward [1881] 6 Q. B. D. 318, where under similar circumstances the master was held not liable. The servant there was forbidden to use the lavatory. However "the law is not so futile as to allow a master, by giving secret instructions to his servant, to discharge himself from liability." Willes, J., in Limpus v. London, 1 Hurl. & C. 526, 529. In Dyer v. Munday, [1895] 1 Q. B. 742, the master was held liable for the unauthorized wrong of his servant in executing a warrant. In Richards v. West Middlesex, [1885] 15 Q. B. 660, under similar circumstances, the master was exonerated. And see Engelhart v. Farrant, [1897] 1 Q. B. 240, and McDowall v. Great Western, [1903] 2 K. B. 331). In Citizens v. Brown, [1904] A. C. 423, the court said: "He [the servant] had no actual authority, express or implied, to write libels, nor to do anything legally wrong; but it is not necessary that he should have had any such authority in order to render the company liable for his acts. The law upon this subject cannot be better expressed than it was by the acting Chief Justice in this case. He said: 'Although the particular act which gives the cause of action may not be authorized, still, if the act is done in the course of employment which is authorized, then the master is liable for the act of his servant.'" (Cf. Palmeri v. Manhattan, 133 N. Y. 261, 30 N. E. 1001, 16 L.R.A. 136, 28 Am. St. 632.)

In view of these later decisions the familiar controversy between Lord Erskine, who recognized the larger liability of the master (see Sleath v. Wilson, 9 Car. & P. 607, approved in Philadelphia v. Derby, 14 How. 468, 14 L. ed. 502), and Lord Cockburn, who restricted it (see Storey v. Ashton, L. R. 4 Q. B. 476, but cf. Venables v. Smith, 2 Q. B. D. 279, at page 283) has a significance which is principally historical. Lord Erskine's ideas appear to have finally prevailed.

5. In America, however, the subject has undergone a radical change; and the master's responsibility has been distinctly increased. Mr. Beven has pointed out, in connection with Craker v. Chicago, 36 Wis. 657, 17 Am. Rep. 504: "Though of the same parentage as

112 M.—14.

ours, American law has in late years been developing along divergent lines, and accepts principles widely applicable that are to us not only novel, but fundamentally unsound." Conspicuously the liability of masters to third persons for the torts of his servant has been materially extended. Beven, Negligence, Preface, vii. Especially the earlier English cases, reasoned from the point of view of the master only. American judges have regarded the controversy both from the point of view of the master and of the person injured. They have placed emphasis, not so much upon the authority of the master as upon the duty imposed upon him to the person injured, which has been violated by the servant. The term "scope of authority," and especially the term "course of employment," and their congeners, have been given a much narrower connotation and wider denotation than in most of the English cases at least. In many groups of cases the master is held liable, although the act be disapproved of or clearly forbidden by the master (Grier, J., in 14 How. 468, 486, 14 L. ed. 502; Singer Mfg. Co. v. Rahn, 132 U. S. 518, 10 Sup. Ct. 175, 33 L. ed. 440), although the motive of the servant was malicious, capricious, and not at all for the master's benefit or purpose, and even where the servant did wrong that he might embezzle for himself or merely injure the master's business. The English criterion is the formal result of a priori reasoning; the American is the natural product of a posteriori reasoning.

## III

The confusion has been in part due to the failure to distinguish between the different ways in which liability for tort may attach. The person sought to be charged in an action ex delicto may be held responsible under one or more of two different classes of circumstances: (1) By virtue of personal commission, single or joint, or by consent before or after the wrong; i. e., by command or ratification. (2) By virtue of relationship, or because of the creation, ownership, custody, or control of instrumentalities intrinsically or potentially dangerous, or otherwise capable of doing harm, or because of conduct operating as estoppel. In the nature of things the ele-

ments of the second class often do not appear isolated. They usually run into each other, and occur blended in combinations in which they are more or less distinctly separable. The vital distinction is between the first and second class of cases. See Amidon, J., in Helms v. Northern Pac. Ry. Co. (C. C.) 120 Fed. 389, 395; Blackburn, J., in Mersey Docks v. Gibbs, 11 H. of L. 686, 715. And see Macdonell, Master & Servant, c. 24.

In the first class of cases, liability attaches to the master's personal act, as where the master participates in the wrong of the servant, or is guilty of initial wrong, as in selecting or retaining an improper servant, or an insufficient number of servants, or in failing to establish rules for their government, and the like. It may also be that the master is held responsible because of his command or consent, given before or after the servant's tort, as where the master has expressly or impliedly authorized or ratified the tort. In such cases the wrong may be fairly said to be that of the master himself. In these cases he is usually culpable. The liability is founded on the doctrine of identification. The servant is the alter ego of the master. Qui facit per alium facit per se.

In the second class of cases, the tort is in no sense the master's personal wrong. He is not exonerated by proof of absence of personal culpability. He is merely held responsible in damages for reasons the law holds sufficient. His liability is "imposed" or "imputed." His authority to the servant to do the act complained of is in strict logic as wholly irrelevant as the fact that he may have expressly forbidden the servant so to act. His authority does not exist in fact. If the language of authority be used, the authority is purely fictitious. See Macdonell, Master & Servant, 247. It exists by construction, and this in cases wherein it is attributed, although the act complained of was not for the benefit of the master, but to his affirmative disadvantage. It is "imputed" or "quasi" (cf. Real and Quasi Contracts, 9 Cyc. 242, 243), as distinguished from "actual," authority.

(a) This is obvious in the familiar cases in which liability attaches by virtue of relationship, existing between the person complaining and the person sought to be charged. A "principal who

contracts to do a particular thing is liable for agent's torts which prevent the performance of the contract." Wharton, Agency, § 487.

The relationship may be that of carrier and passenger. The carrier is liable for breach of his duty imposed by common law "of protecting each passenger from avoidable discomfort, from insults, indignities, and personal violence." Singer v. Taylor, 150 Ala. 574, 43 South. 210, 9 L.R.A.(N.S.) 929, 124 Am. St. 90; Birmingham v. Baird, 130 Ala. 334, 30 South. 456, 54 L.R.A. 752, 89 Am. St. 43. Craker v. Chicago, supra. Possible advantage to the master is entirely irrelevant. A street car conductor throws a dead hen at the motorman of another car, and strikes plaintiff, a passenger therein. The car company is liable. Hayne v. Union, 189 Mass. 551, 76 N. E. 219, 3 L.R.A.(N.S.) 605, 109 Am. St. 655. And see Savannah v. Wheeler, 128 Ga. 550, 58 S. E. 38, 66 Cent. Law J. 23, note; and compare with McCarthy v. Timmins, 178 Mass. 378, 380, 59 N. E. 1038, 86 Am. St. 490, and Hayes v. Wilkins, 194 Mass. 223, 80 N. E. 449, 9 L.R.A.(N.S.) 1033, 120 Am. St. 549.

The relationship may be that of innkeeper and guest. The best discussion as to whether the innkeeper is liable for tort of servant committed for his own purposes will be found in the majority and dissenting opinions in Clancy v. Barker, 131 Fed. 161, 66 C. C. A. 469, 69 L.R.A. 653. And see 71 Neb. 83, 98 N. W. 441, 69 L.R.A. 642, 115 Am. St. 559.

The relationship may be vendor and vendee. In Stranahan v. Coit, 55 Oh. St. 398, 45 N. E. 634, 4 L.R.A.(N.S.) 506, the master, the vendor, was held liable to his vendee for the act of his servant, done with intent to injure the master's business, in adulterating milk contrary to statute.

The relationship may be that subsisting between the proprietor of a place of amusement and a patron who has paid admission. Drew v. Peer, 93 Pa. St. 234; Dickson v. Waldron, 135 Ind. 507, 34 N. E. 506, 35 N. E. 1, 24 L.R.A. 483, 488, 41 Am. St. 440; cf. Williams v. Mineral City, 128 Iowa, 32, 102 N. W. 783, 1 L.R.A. (N.S.) 427, 111 Am. St. 184.

The relationship may arise out of contract generally. A watchman hired by defendant, who has agreed to guard plaintiff's house,

burglarizes it; the defendant cannot escape liability on the "ground * * * that he never authorized that other person to do the particular act complained of." Williams v. Brooklyn, 12 Misc. 565, 567, 33 N. Y. Supp. 849. And see Jones v. Morgan, 90 N. Y. 4, 43 Am. Rep. 131. (Cf. Foster v. Essex Bank, 17 Mass. 479, 9 Am. Dec. 168, to which, without any appearance of conscious humor, defendant has referred us. That case was decided on the theory that no circumstances were shown from which could be inferred authority of the master to the servant to steal bags of gold delivered to defendant bank as bailee. Therefore the bank could not be held responsible for its servant's theft.)

The relationship need not be contractual; it may be merely conventional. The servant, for his own amusement or other personal purpose, assaults one whom the master has invited to use his premises as a store, station, or saloon; the master is liable, irrespective of the servant's authority or motive, or the master's benefit. Most of the many cases in this group will be found collated in Cressy v. Republic Creosoting Co., 108 Minn. 349, 356, 122 N. W. 484. And see notes to McDermott v. Sallaway (198 Mass. 517) 21 L.R.A. (N.S.) 456. So a railroad company may be liable for failure, e. g., to give prescribed warning to pedestrians at a crossing, or to protect persons near its works, as those loading cars; the owner of adjacent premises may be liable to persons on the highway for the misconduct, of his servant; et sim. There are many other classes of cases similar on principle.

(b) The same situation is presented when liability attaches because the master has put in the servant's power an ability to do damage by means of instrumentalities dangerous intrinsically or potentially. See O'Brien v. American Bridge Co., 110 Minn. 364, 125 N. W. 1012. This is a natural, though somewhat remote, extension of the familiar principle given extreme expression in Rylands v. Fletcher, L. R. 3 H. L. 330, and in some cases of nuisance modified so as to meet the facts of each case. Servants, contrary to orders, take a dog out of an inclosure and into the presence of the person whom it injures. The employer cannot escape liability because the wrong was beyond the scope of the servant's authority. Fye v. Chap-

in, 121 Mich. 675, 680, 80 N. W. 797.   An employee of defendant blows a whistle (Texas v. Scoville, 62 Fed. 730, 10 C. C. A. 479, 27 L.R.A. 179; Alsever v. Minneapolis, 115 Iowa, 338, 88 N. W. 841, 56 L.R.A. 748; but see Ballard v. Louisville, 128 Ky. 826, 110 S. W. 296, 16 L.R.A.(N.S.) 1052), or explodes a torpedo (Railway Co. v. Shields, 47 Oh. St. 387, 24 N. E. 658, which contains an especially valuable discussion; but cf. Sullivan v. Louisville, 115 Ky. 447, 74 S. W. 171, 103 Am. St. 330) for his own amusement, and a horse runs away.   Plaintiff, injured thereby, it is quite generally recognized, can recover from the master.

(c) The principle is the same in many cases where the work of the servant is not naturally dangerous to third persons.   The liability is recognized in the master largely because the master has put it in the power of the servant to inflict harm by investing him with means, or by putting him in positions innocent enough in themselves.   In cases of false imprisonment or malicious prosecution, for example, an officer of the law is in no wise, or but little, assisted in making an arrest by the fact that he may be in defendant's employ.   The master's responsibility, if any, must depend largely on his authority, express or implied, actually conferred on his servant.   The more restricted rule of liability usually controls cases of this kind.   This is often true, also, in cases of assault and battery.   The master's liability naturally involves the question of his authority to his servant, except where the circumstances impose a special duty of protection or hospitality.   Supra; and see Mr. Shumaker's article in 5 Current Law, 275.   For example: A train or car man who assaults a person on premises in which his employer has no property or interest ordinarily commits an independent tort.   The fact that he is a servant has no natural tendency to contribute to or to aggravate the wrong, and is naturally wholly disconnected from it.   Yet a street car conductor, subject to a rule to prevent boys from catching on cars, who strikes a boy running by the side of the car, renders a car company liable. Hewson v. Interurban, 95 App. Div. 112, 88 N. Y. Supp. 816 (the collation of trespasser cases on pages 114, 115, of 95 App. Div., and page 818 N. Y. Supp., is valuable).

When, for example, the railroad trainman throws a trespasser

from a moving train the situation is substantially different. The facts of the service on the train and of the trespasser's place on the moving cars are necessarily conditions precedent to the commission of the wrong, and, in connection with the physical environment and the speed of the train, may determine the fact and extent of damage. If the trespasser is attempting to get on a train, he may be prevented by force without liability to the master; but his situation, if once on the moving car, has a direct effect on the master's responsibility for the force exercised in his removal. Kline v. Central, 37 Cal. 400, 99 Am. Dec. 282. And if the assault be committed before the trespasser has left the car, and is completed by a brakeman who follows the plaintiff off the car, the defendant may be liable. Girvin v. New York, 166 N. Y. 289, 59 N. E. 921. It is, however, too obvious to justify discussion that, e. g., an assault by a trainman on a trespasser when in a train at rest in a railroad yard and when in a train moving rapidly over a high bridge involves radically different applications of elementary rules of law. The master is under no affirmative duty to take care of a trespasser, but is subject to the familiar rule applied to trespassers generally, to abstain from wilful or wanton harm. Kansas City v. Kelly, 36 Kan. 655, 14 Pac. 172, 59 Am. Rep. 596; Marion v. Chicago 59 Iowa, 428, 13 N. W. 415, 44 Am. Rep. 687; Illinois v. Godfrey, 71 Ill. 500, 22 Am. Rep. 112; Illinois v. King, 179 Ill. 91, 53 N. E. 552, 70 Am. St. 93; Holler v. Ross, 68 N. J. L. 324, 53 Atl. 472, 59 L.R.A. 943, 96 Am. St. 546; Johnson v. Great Northern, 49 Wash. 98, 94 Pac. 895; De Vane v. Atlanta, 4 Ga. App. 136, 60 S. E. 1079; Gates v. Quincy, 125 Mo. App. 334, 102 S. W. 50; Magar v. Hammond, 183 N. Y. 387, 390, 76 N. E. 474, 3 L.R.A. (N. S.) 1038; Illinois Central v. Brown (Miss.) 39 South. 531 (brakeman). Cf. Ellington v. Great Northern Ry. Co., 96 Minn. 176, 104 N. W. 827, 829.

That the servant's motive in violating that duty was malicious is immaterial. Chicago v. Kerr, 74 Neb. 1, 104 N. W. 49, 54 (brakeman); Dealy v. Coble (1906) 112 App. Div. 296, 98 N. Y. Supp. 452. (The transition in thought from the original rule following McManus v. Crickett is apparent with the contrast of this last case

with Wright v. Wilcox (1838) 19 Wend. (N. Y.) 343, 32 Am. Dec. 507, still sometimes cited as authority.) The motive of the servant generally, whether to act for the master's benefit or not, is not vital. Kansas City v. Kelly, 36 Kan. 655, 659, 14 Pac. 172, 59 Am. Rep. 596.

While the language of authority is often used to describe the liability of the master under such and similar circumstances, it is strained to meet the conclusion which the court has reached by independent reasoning, as in Rowell v. Boston, 68 N. H. 358, 44 Atl. 488. Cf. Barmore v. Vicksburg, 85 Miss. 426, 38 South. 210, 70 L.R.A. 627. Thus the learned editor, in 27 L.R.A. 162, justly says of the familiar and leading case on this subject, Rounds v. Delaware, 64 N. Y. 129, 21 Am. Rep. 597, Chase L. C. Torts (2d ed.) 600 (in which a boy trespasser was thrown from a moving train): "The absurdity of those statements (as to express and implied authority) taken together is such that the learned judge who made them never would have done so, had he not wished to apparently conform to precedents by which he did not intend to be bound, as is apparent from the remainder of the opinion." At the end of the opinion the court rests the master's liability expressly upon the violation by the servant of the master's negative duty to abstain from wilful violence.

(d) On the same principle, the conduct of the master, the place, implements, facilities for doing business, and the course of the business or dealing may justify third persons in believing that the servant had certain powers conferred upon him and in acting in reliance thereon. Thus is created a duty to them, or, as is often said, the servant is given not real, but imputed, authority, commonly called "apparent authority." A telegraph agent, who is also an express agent, forges and sends a message from a merchant to his local correspondent for a purchase of grain. The agent steals the remittance. The telegraph company is liable, not because of the agent's authority or motive to benefit the master, but because a duty to third persons is imposed on the master by law, which the master has put in the power of the agent to violate. McCord v. Western Union Tel. Co., 39 Minn. 181, 39 N. W. 315, 1 L.R.A. 143, 12 Am. St. 636; Jasper v. Southern, 99 Ala. 416, 14 South. 546, 42 Am. St. 75. On much the same theory a railroad company is often, but not universally, held liable for a fraudulent bill of lading issued by an agent, who

has appropriated the proceeds. Bank v. New York, 106 N. Y. 195, 12 N. E. 433, 60 Am. Rep. 440; Planters v. Bank, 78 Ga. 574, 3 S. E. 327. Cf. contra: Friedlander v. Texas & Pac. Ry. Co., 130 U. S. 416, 9 Sup. Ct. 570, 32 L. ed. 991; and see National Bank of Commerce v. Chicago, B. & N. R. Co., 44 Minn. 224, 46 N. W. 342, 560, 9 L.R.A. 263, 20 Am. St. 566.

(e) This is really the principle involved in cases in which the liability of the master is worked out in the language of estoppel. A secretary of a corporation, intrusted with the seal of a corporation and authorized to sign certificates of stock, issues unauthorized certificates and appropriates the proceeds. The agent, having no authority, could not have acted for his employer, but the corporation is held estopped from denying the validity of the fraudulent issue. See New York v. Schuyler, 34 N. Y. 30; Fifth Avenue v. Forty Second St., 137 N. Y. 231, 33 N. E. 378, 19 L.R.A. 331, 33 Am. St. 712. Great English judges have deplored their inability to enforce the just American rule. Their own authorities deny it. See British v. Charnwood, 18 Q. B. D. 714.

## IV

Indefinite confusion is produced by this paradox; criteria of liability formulated by the courts have generally no logical connection with the reasons for which liability is recognized by the law. All dictates of proper thought would lead to the creation of a test of liability which would be a natural result of, if not the formulated reason for, liability. In point of fact the real basis of the master's liability and its accepted criterion are often absolutely divorced. The same estrangement appears in the terminology employed. The standard is adopted, not in pursuance of the logical basis of liability, but to accord with surviving tradition. In the effort to achieve consistency by the establishment of one test the courts have produced confusion worse confounded. A necessarily abbreviated review of some of the various reasons for imposing the apparent hardship of liability on a personally innocent master it is hoped will tend to clarify the situation.

Negatively, the doctrine of identification, as has been pointed out,

suffices only when the tort complained of is the master's own by commission or consent, including ratification, and when the law has imposed no duty to a third person on the master, but rarely, if ever, in any other case. Respondeat superior is not a reason, but only a dogmatic restatement of the rule. Neither the lawfulness or unlawfulness, nor the maliciousness, mischief, or the caprice of the servant's conduct, is an invariable reason for the master's exoneration of liability.

Affirmatively there are numerous reasons of public policy "which have had their origin in history, not in science." Sometimes one is exclusive and sufficient; sometimes many concur to produce the rule. Often the result is clear and explicit; often obscure and inferential.

1. The fundamental underlying reason applicable in such cases from general considerations of policy and security (see Moody, J., in Standard Oil Co. v. Anderson, 212 U. S. 215, at page 221, 29 Sup. Ct. 252, 53 L. ed. 480) is that announced in Farwell v. Boston, 4 Metc. (Mass.) 49, 55, 38 Am. Dec. 339: "This rule is obviously founded on the great principle of social duty that every man in the management of his own affairs, whether by himself or by his agents or servants, shall so conduct them as not to injure another; and if he does not, and another thereby sustains damage, he shall answer for it." See Anderson v. Pittsburgh Coal Co., 108 Minn. 455, 463, 122 N. W. 794.

2. The expediency of having a remedy against some one capable of paying damages (see Willes, J., in Limpus v. London, 1 H. & C. 526; McClung v. Dearborne, 134 Pa. St. 396, 406, 19 Atl. 698, 8 L.R.A.[N.S.] 204, 19 Am. St. 708), and of making a "master careful in the point of whom he employs" (Bramwell, L. J., in Swainson v. Northeastern, 3 Ex. Div. 341, at page 348), has been regarded as a general consideration. It is obviously not an adequate universal reason. Guy v. Donald, 203 U. S. 399, 406, 27 Sup. Ct. 63, 51 L. ed. 245.

3. The master is sometimes regarded as the "causa causans" of the mischief. Grier, J., in Philadelphia & Reading R. Co. v. Derby, 14 How. 468, 487, 14 L. ed. 502. And see Duncan v. Findlater, 6 Clark & F. 894; Quarman v. Burnett, 6 M. & W. 499; Mersey Docks

v. Gibbs, 11 H. of L. 716, 717. Negatively the master is not answerable for a tort of one whom he cannot select, control, or discharge, as a pilot whom he is compelled to accept. Guy v. Donald, supra. So there has often been applied the rule of public policy, not invariably of law, that, when one of two innocent persons must suffer by acts of a third, he who has enabled such third person to occasion the loss must bear it. Essentially the basis of the later English doctrine is this: "The grounds upon which it seems to rest, as explained in cases such as Barwick v. English Joint Stock Bank [L. R.] 2 Ex. 259, appear to be that the principal is the person who has selected the agent, and must therefore be taken to have had better means of knowing what sort of a person he was than those with whom the agent deals on behalf of his principal, and that, the principal having delegated the performance of a certain class of acts to the agent, it is not unjust that he, being the person who has appointed the agent, and who will have the benefit of his efforts if successful, should bear the risk of his exceeding his authority in matters incidental to the doing of the acts the performance of which has been delegated to him." Hamlyn v. Houston [1903] 1 K. B. 81, 85, 86. And see Houldsworth v. City [1880] 5 A. C. 317, at page 326; Citizens v. Brown [1904] A. C. 423, at page 428. Cf. Ploof v. Putnam, 83 Vt. 252, 75 Atl. 277.

4. Estoppel may account for liability, because the master has retained the benefit of the servant's wrong, as in some cases of fraud and conversion (see Lord Mansfield, in Hambly v. Trott, Cowp. 371), and because of consideration of purely general policy (e. g., New York v. Schuyler, supra.)

5. The motive of the servant for the purpose or benefit of the master is regarded both as reason for and as a criterion of the master's liability. It is clear that the benefit of the master, as that expression is used in England, is often misleading and sophistical. See Macdonell, Master & Servant, 242. The gist of the rule is that the motive of the servant must have been to have performed his duty to, or to further the business or the interests of, the master. It is not at all necessary that the actual result should have been to the master's

benefit.    The cases on this subject resolve themselves into three classes:

(a) There are cases in which no recognized legal obligation to the party injured has been violated, where the controlling consideration is ·quite frequently held to be that the servant must have acted with the intention of furthering the master's business.    See New York v. United States, 212 U. S. 481, 493, 29 Sup. Ct. 304, 53 L. ed. 613; Kwiechen v. Holmes & Hallowell Co., 106 Minn. 148, 118 N. W. 668, 19 L.R.A.(N.S.) 255.    But see dissenting opinion.    Compare Curran v. Olson, 88 Minn. 307, 92 N. W. 1124, 60 L.R.A. 793, 97 Am. St. 517, with Anderson v. Diaz, 77 Ark. 606, 92 S. W. 861, 4 L.R.A.(N.S.) 649.

(b) Where the law recognizes that a duty is owed to the person injured, and that duty has been violated by the servant, the liability of the master follows, irrespective of the motive of the servant or the benefit of the master.    A., for example, is employed to warn persons who go over a crossing near a sharp curve of the approach of a train. He forgets to do so; he falls asleep or gets drunk, and B. is run over; A's employers would, it is conceived, be answerable, even under the English law, for misconduct certainly not intended to benefit them. Macdonell, Master & Servant, 242.    Cf. Smith v. Southeastern, [1896] 1 Q. B. 178.    (Quære, if a servant be insane, see Christian v. Columbus, 79 Ga. 460, 7 S. E. 216; Id., 90 Ga. 124, 15 S. E. 701; and see Cole v. Corporation, 4 Sneed [Tenn.] 162.)    And compare Stranahan v. Coit, 55 Oh. St. 398, 45 N. E. 634, 4 L.R.A.(N.S.) 506; with Nelson v. Lloyd, 60 Oh. St. 448, 54 N. E. 471, 46 L.R.A. 316, 71 Am. St. 729.    This subject has been previously discussed.

(c) Two motives may co-exist in the mind of the wrongdoer; one his own personal motive, and the other the benefit of the master and the furtherance of the master's business.    Many, but not all, cases refuse to subtly distinguish between the two classes of motives, and hold the master liable unless the motive be purely and solely personal to the servant.    See Gracey v. Belfast [1901] 2 I. R. 322; New Ellerslie v. Stewart, 123 Ky. 8, 93 S. W. 598, 9 L.R.A.(N.S.) 475; Macdonell, Master & Servant, collecting cases, on page 243. The cases recognizing the liability of the master despite the deviation of the servant from the prescribed journey of his vehicle are familiar illustrations of this principle.

6. The distinctive reasons for the American rule have been previously pointed out. In an increasingly large number of cases, and of classes of cases, the master is held responsible for the act of his servant as an instrumentality (cf. Innes, Torts), not because the servant was in any wise authorized to do the wrong, or because of his intention to benefit the master's business, but because he has violated the duty which the master owes to third persons. 27 L.R.A. 161, 163. The rule in Craker v. Chicago, supra, is properly to be regarded as of general application, not as confined to carrier cases. That criticism states merely a rule of thumb or of indexing or digesting. In Schaefer v. Osterbrink, 67 Wis. 495, 30 N. W. 922, 58 Am. Rep. 875, the court, in approving the doctrines in the Craker case, said: "The mere fact that the conductor's duty to the passenger * * * arose out of the passenger's contract with the master does not confine the principle involved to the breaches of duty created by contract." Responsibility for damages resulting from racing sleighs on a public highway was accordingly attributed to the master. So in Winslow v. Commercial (Iowa) 124 N. W. 320, it was held that, whenever the law imposes a personal duty upon any one, he cannot escape responsibility therefor, for the manner of its performance, by delegating its performance to another.

V

The equivocation in the constantly recurring middle terms "authority," "scope of authority," "course of employment," and their congeners, is also a prolific source of error in decision. The reasoning of the law in this connection has been largely formal and nominalistic. It is saturated with the methods of the Schoolmen. Its vices are those of mediaeval logic. The inevitable penalty for failure to clearly define terms has been peculiarly marked. In this connection Holmes, J., in Guy v. Donald, 203 U. S. 399, 406, 27 Sup. Ct. 63, 51 L. ed. 245, has aptly said: "As long as the matter to be considered is debated in artificial terms, there is a danger of being led by a technical definition to apply a certain name, * * * then to deduce consequences which have no relation to the grounds on which

the name was applied." In numberless instances, gross miscarriage of justice has resulted.

(a) It has just been pointed out that "authority" is used in three senses: (1) That of real or actual authority, express or naturally implied; (2) that of fictitious or imputed authority, of which (3) apparent authority is really one variety. The ambiguity is plain. We reiterate: It is a palpable misnomer to hold the master liable because of the authority to the servant to do the thing which the master has openly, in good faith, and expressly forbidden the servant to do. It is still more misleading to trace the liability of the master to the authority of the servant, when the master has not only forbidden the servant's conduct, but also when the servant has not acted in the furtherance of the master's business, nor for the protection of the master's property, nor in performance of his assigned duty, but for the servant's own benefit, and to the master's damage. Yet, as has been pointed out, in many groups of such cases the master has been held responsible. The authority of the master survives, as a "lazy, easy reason" for the master's liability.

The term "implied authority," as used generally and by the trial court here, is worse than ambiguous. It is constantly treated as including (1) authority which is naturally inferred from actual authority; (2) authority apparent from the course of dealing between the parties, or from an established and known course of business; (3) imputed by law on recognized principles entirely apart from the actual instructions given. A jury is generally the proper judge in the first class of cases, often of the second, and rarely, if ever, of the third. The authorities have recognized the certainty of consequent errors. Macdonell, Master & Servant, 247, note "f;" 4 L.R.A.(N.S.) 49.

The subject is further confused by the fact that this law on master and servant is intimately related to, and largely, but indiscriminately, drawn from that of principal and agent. The rule of master and servant concerns all acts of the representation which are noncontractual, and the rule of principal and agent such as are contractual. Hence, for example, an insurance solicitor, who makes false representation as to the business in hand, has been regarded as acting on be-

half of the insurance company in a ministerial, and not in a contractual, capacity.  Fraud has therefore been held to be chargeable to the insurance company, irrespective of the actual authority, and written restrictions on the agent's authority to be immaterial.  Almost as many authorities have reached the opposite conclusion.  See Mr. Vance in 4 Mich. Law Rev. 208–213.

(b) Quite as marked an equivocation and as great an uncertainty occurs in the current use of the middle terms "scope of authority" and "course of employment," and their antonyms and synonyms. "Much of the confusion in the decisions exists by reason of difficulty in determining what the courts mean by the phrase 'scope of employment.'  If the same meaning were attached to this phrase by all of the courts using it in deciding the point under discussion, most of the confusion would vanish, and in many instances it would probably appear that decisions apparently conflicting were in reality harmonious, since it is used to describe acts ranging all the way from one clearly within the line of duty to one entirely outside it, but committed during the continuance of the contract relationship between the master and the party injured, and in direct violation thereof." Note, 4 L.R.A. (N.S.) 49.  In England generally, and in America frequently, they are used indiscriminately.  The later English cases, however, seem (for the matter is not certain) to have followed the general American usage and regard the "course of employment" as indicating the widest measure of liability, as distinguished from "scope of authority," which signifies the more restricted rule.  Compare later English cases previously cited and Mr. Abbott's celebrated note to Mallach v. Ridley, 24 Abb. N. C. 172–184, with Macdonell, Master & Servant, 241, 242.

(c) It is obvious that accurate and certain definition of these terms, "authority," "implied authority," "scope of authority," "course of employment," and the like, is a sine qua non to correct reasoning.  Such a definition is rarely, if ever, to be found.  Identically the same charge is given the jury in different jurisdictions to describe entirely different and inconsistent criteria.  Miscarriage of justice is inevitable.  The correct definition, it will be found, must re-

solve itself into an enlarged formula of the standard of liability applicable to the particular case.

## VI.

It follows from the previous discussion: (1) The master's liability is conditioned on proof of damage consequent on the wrong committed by one who at the time is a servant of the master and under such circumstances that liability is attached to the master under the criterion prevailing in the jurisdiction, and appropriate to the circumstances involved. (2) Liability may attach under the Blackstone test, the English test of motive and benefit, or the American test of duty violated. (3) No one rule of liability is the sole or invariable standard. Different specific torts, and the same tort committed under different circumstances, may involve the application of different principles. (4) The test of responsibility should be determined primarily by the reason the law assigns, and not by incidental or collateral circumstances, to be consistent with tradition. (5) The terms "implied authority," "scope of authority," "course of employment," and the like when used, should be clearly defined. (6) Generally little significance is to be attached to the fact that a given conclusion is or is not sustained by a group of related cases. Many decisions are negligible, because they constitute anachronisms in history, anomalies in logic, and aberrations from accepted general principles. (7) The fact that liability was attached to the master under a restricted criterion of liability is entirely consistent with holding him, under other and appropriate circumstances, responsible under an enlarged standard. (8) The tendency of the cases is to increasingly regard the question of the master's responsibility as one of fact, to be determined by the jury.

## VII.

In this case the first question is whether the defendant was entitled to a directed verdict; if so, plaintiff is not entitled to a new trial. Defendant argues on this appeal that: "A brakeman upon

a passenger train is presumed to have authority to eject from his train a person who is obviously a trespasser. But * * * the presumption does not obtain where such person is not obviously a trespasser, and therefore the ejection of such a person would be without the scope of his authority." The subtlety, artificiality, and fallacy of this reasoning are apparent. The confusion as to authority and scope of authority is familiar. It might well be held that actual authority could be implied from the situation, but the liability of the master is independent of authority of that sort. It might exist, although the master is shown to have expressly forbidden the brakeman to determine the question or to expel the person from the train. The criterion for which defendant contends has been abandoned by courts of this and every other jurisdiction, including England and Massachusetts, for more than a century.

The question then arises whether plaintiff is entitled to a new trial. The court charged first that the master was liable within the scope of the brakeman's actual authority, express or implied. He then charged that the master was liable for what the servant did in the course of his employment with a view to the furtherance of the master's business, and not for any purpose personal to himself, in which case the actual authority was immaterial. He finally charged that the company was not liable if the act was beyond the scope of his actual agency or authority. It is obvious that this charge submitted the Blackstone test, then the later English criterion, and finally reverted to the rule of the great commentator. The anachronism is as plain as it is confusing. The criteria are hopelessly inconsistent. Under the first charge, "if * * * authority was expressly withheld or its exercise forbidden, then * * * the defendant company would not be liable." Under the second charge, "the fact that [the brakeman] exceeded his actual authority, or even disobeyed his instructions, would not alter the rule" that the defendant would be liable.

This court itself held, in Brevig v. Chicago, St. P. M. & O. Ry. Co. 64 Minn. 168, 174, 66 N. W. 401, 404: "A railway company owes trespassers no contract duty. Neither are trespassers in a position to invoke the doctrine of apparent authority. They can only,

under any circumstances, hold the company liable for acts of its agents or servants done within the scope of their actual authority, either express or implied." But in Barrett v. Minneapolis, St. P. & S. S. M. Ry. Co. 106 Minn. 51, 57, 117 N. W. 1047, 1049, 8 L.R.A.(N.S.) 416, 130 Am. St. 585, the court said: "A master is responsible for the torts of his servant, done in the course of his employment with a view to the furtherance of his master's business, and not for a purpose personal to himself, whether the same be done negligently or wilfully, but within the scope of his agency, or in excess of his authority, or contrary to the express instructions of the master." The same conclusion must be reached if the question of liability be based on the violation by the servant of the duty to abstain from wilful harm the defendant owed to plaintiff.

Reversed.